SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Mist Pharmaceuticals, LLC v. Berkley Insurance Company** (A-34-24) (089689)

**Argued October 9, 2025 -- Decided May 11, 2026**

**JUSTICE PATTERSON, writing for the Court.**

In this appeal, the Court considers whether an insurer properly denied coverage based on an exclusion set forth in an insurance policy it issued to a limited liability company or whether, as the insured argues, the insurer forfeited its right to rely on the exclusion and is estopped from disclaiming coverage.

In April 2014, defendant Berkley Insurance Company (Berkley) issued a Directors and Officers insurance policy to plaintiff Mist Pharmaceuticals, LLC. Mist Pharmaceuticals was an Insured Entity under the policy terms and Joseph Krivulka, Chair of the Board of Directors and a member and manager of that entity, was an Insured Person in that capacity.  The policy's capacity provision excluded from coverage "Loss in connection with a Claim made against any Insured . . . in any way involving any Wrongful Act of an Insured Person serving in their capacity as . . . member . . . of any other entity other than an Insured Entity or an Outside Entity, or by reason of their status as . . . member . . . of such other entity."

The coverage dispute now before the Court arose from allegations in two lawsuits that Krivulka engaged in self-dealing through Mist Pharmaceuticals and other entities he controlled, which were also named as defendants.  Mist Pharmaceuticals was the only defendant entity that Berkley insured.

Mist Pharmaceuticals filed a claim for coverage under its Berkley policy. Berkley acknowledged the claim, reserving "all rights under the Policy, at law, and in equity, including, but not limited to, the right to raise Policy terms and conditions as defenses to coverage as may be appropriate in light of additional information received by us."  Berkley stated that coverage was not available "for Krivulka for allegations pertaining to his roles with" entities other than Mist Pharmaceuticals. Berkley reserved its rights under the capacity exclusion, setting forth the text of that exclusion in its letter to Mist Pharmaceuticals.  It reiterated that nothing in its letter "should be construed as a waiver, modification or estoppel of any rights or defenses."  Berkley agreed to reimburse Mist Pharmaceuticals for 10% of legal fees already incurred and "to pay 10% of the reasonable legal fees moving forward."

1

In August 2017, following further correspondence, Berkley withdrew "its participation in the defense" of Mist Pharmaceuticals and Krivulka, "effective immediately," based on its contention that the claim against Mist Pharmaceuticals arose prior to the policy period. It reiterated its prior reservation of rights.

In September 2017, Mist Pharmaceuticals filed this coverage action. It contended that Berkley had taken unjustified and inconsistent positions by paying ten percent of the defense costs for nearly a year but then denying coverage. Berkley filed a counterclaim seeking restitution of the legal fees it had paid. It claimed that Mist Pharmaceuticals' "failure to comply with Berkley's reporting requirements" had hampered the investigation of the claim and compelled Berkley to pay defense costs for a claim that its policy did not cover.

While the coverage matter was pending, Mist Pharmaceuticals repeatedly requested that Berkley participate in the negotiation of a global settlement. Berkley declined, reiterating that it did not believe it owed coverage. In June 2020, the parties agreed to a global settlement.

Ultimately, the trial court entered final judgment for Mist Pharmaceuticals and against Berkley, requiring that Berkley provide coverage up to what remained of the policy limit. The Appellate Division reversed. 479 N.J. Super. 126, 143 (App. Div. 2024). The Court granted certification. 260 N.J. 92 (2025).

**HELD:** The claims asserted in the underlying actions fall squarely within the disputed exclusion; the insurer properly reserved its rights with respect to that exclusion in its communications with the insured; and the insurer had the right to refuse to contribute to the settlement under the circumstances of this case. The Court affirms as modified the Appellate Division's judgment as explained on pages 32 n.8 and 48-49 of the Court's opinion.

1. There is an important distinction between an exclusionary clause that applies only if the evidence supports a causal link between the excluded act and the loss alleged -- as in Flomerfelt v. Cardiello, 202 N.J. 432 (2010) -- and an exclusionary clause that does not expressly require such a causal nexus in order to apply -- as in Norman Int'l, Inc. v. Admiral Ins. Co., 251 N.J. 538 (2022), in which the exclusion provided that the policy did not apply to several categories of injury "arising out of, related to, caused by, contributed to by, or in any way connected with . . . [a]ny operations or activities performed by or on behalf of any insured" in certain New York counties," id. at 546. In Norman International, the Court observed that "[b]ecause the exclusion test is disjunctive, each phrase in the exclusion must be considered separately, any one of which would be sufficient to trigger the exclusion." Id. at 555. (pp. 29-31)

2

2.  The Court views the exclusionary clause here to be closely analogous to the exclusion at issue in Norman International.  Here, as in Norman International, the disjunctive "or" means that each term in the exclusion is alone sufficient to bar coverage.  The exclusionary clause at issue here does not turn on a causal nexus between the excluded activities and the harm alleged.  To the contrary, it applies "to the extent the allegations" in the underlying actions "in any way" involved "any Wrongful Act of an Insured Person serving in their capacity as . . . member" of any entity other than "an Insured Entity or an Outside Entity," or "by reason of their status as . . . member . . . of such other entity."  The policy, in turn, defines "Wrongful Act" to include "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act" by an insured person in that person's capacity as a member of an uninsured entity.  Here, the factual allegations involve more than a dozen Krivulka-owned or controlled entities, but they share a common feature:  Krivulka's role as member and manager of one particular entity -- an entity other than Mist Pharmaceuticals and not insured by Berkley -- is front and center in all.  There is no allegation against Mist Pharmaceuticals -- or against Krivulka as a director, member, or manager of Mist Pharmaceuticals -- that is unrelated to Krivulka's capacity as a member of the uninsured entity.  Accordingly, the allegations asserted in the underlying actions clearly fall within the scope of the capacity exclusion.  The Court responds to the dissent's argument for an alternative interpretation of the capacity exclusion.  (pp. 31-39)

3.  The Court next reviews the cases under which Mist Pharmaceuticals argues that Berkley is precluded from asserting its rights under the capacity exclusion: Fireman's Fund Insurance Co. v. Security Insurance Co., 72 N.J. 63 (1976), and Griggs v. Bertram, 88 N.J. 347 (1982).  In Fireman's Fund, the insurer had clearly breached its obligations under the subject policy and acted in bad faith; the Court accordingly held that it had forfeited its right to control the settlement of the underlying claims.  72 N.J. at 68-73.  In Griggs, an insured provided his insurer with notice that a claim could be brought against him after he punched someone at a baseball game.  88 N.J. at 353.  Although the defendant's insurance policy excluded coverage for an intentional tort, the insurer "gave no indication that any potential claim or legal action arising from this incident would not be covered under the policy or that it would disclaim coverage in the event such a claim or action were brought."  Ibid.  The insurer disclaimed coverage based on the intentional tort exclusion 17 months later.  Id. at 354.  The Court held that "where, after timely notice, adequate opportunity to investigate a claim, and the knowledge of a basis for denying or questioning insurance coverage," an insurer "fails for an unreasonable time to inform the insured of a potential disclaimer," that insurer "is estopped from later denying coverage under the insurance policy in the event a legal action is subsequently brought against its insured."  Id. at 363-64.  (pp. 40-44)

3

4.  Neither <u>Fireman's Fund</u> nor <u>Griggs</u> stands for the proposition that an insurer is somehow barred from contesting its obligation to cover a given claim or from seeking to enforce an exclusion in its policy.  Neither decision addressed a setting in which the insurer invoked an exclusion or provided a reservation of rights.  Reservation of rights letters have long been regarded as proper defense mechanisms for insurance companies, and a good-faith challenge to coverage is not a breach of an obligation to defend.  Here, the policy issued by Berkley does not cover Mist Pharmaceuticals for the claims asserted.  There is, accordingly, no basis for a finding that Berkley acted in bad faith, and indeed no such finding was made in this case.  Berkley did not forfeit any contractual right when it declined to participate in the settlement of what it determined -- correctly -- to be uncovered claims.  <u>Fireman's Fund</u> is inapplicable to this appeal.  Nor is Mist Pharmaceuticals correct in asserting that the circumstances of this case warrant a finding of estoppel under <u>Griggs</u>.  During the five years preceding the global settlement on June 23, 2020, Berkley repeatedly restated the full text of its capacity exclusion in correspondence with Mist Pharmaceuticals.  It reserved its rights under that exclusion and other policy provisions in letters and emails no fewer than ten times.  And Berkley advised Mist Pharmaceuticals at least six times that nothing in its correspondence should be construed as a waiver, modification, or estoppel of its rights, which included its right to rely on the capacity exclusion set forth in its policy.  In sum, the Court does not view the doctrine of estoppel or the doctrine of forfeiture to support Mist Pharmaceuticals' position in this appeal.  (pp. 44-48)

**AFFIRMED AS MODIFIED.**

**JUSTICE FASCIALE, dissenting**, stresses that, for over five years, Berkley repeatedly represented to the Mist Insureds that partial coverage was available under the policy at issue.  Justice Fasciale views case law to demand that Berkley be held to its prior assurances and estopped from relying on the capacity exclusion as an absolute defense.  In Justice Fasciale's view, the exclusion does not bar <u>all</u> coverage when wrongful acts are simultaneously committed in both insured and uninsured capacities -- it bars coverage only for wrongful acts committed in an uninsured capacity.  At best, Justice Fasciale notes, there is more than one way to interpret the exclusion, requiring -- under longstanding insurance jurisprudence -- that the Court apply the meaning that supports coverage.  Because, under that meaning, it is necessary to distinguish between Krivulka's insured and uninsured roles to determine what the insurer is required to cover, Justice Fasciale would remand the matter for the determination of four disputed issues of material fact.

**CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS, WAINER APTER, and NORIEGA join in JUSTICE PATTERSON's opinion.  JUSTICE FASCIALE filed a dissent in which JUSTICE HOFFMAN joins.**

4

Mist Pharmaceuticals,
LLC,

Plaintiff-Appellant,

v.

Berkley Insurance
Company,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
479 N.J. Super. 126 (App. Div. 2024).

| Argued | Decided |
|---|---|
| October 9, 2025 | May 11, 2026 |

Lynda A. Bennett argued the cause for appellant
(Lowenstein Sandler, attorneys; Lynda A. Bennett and
Eric Jesse, of counsel and on the briefs).

Adam M. Smith argued the cause for respondent
(Coughlin Midlige & Garland, attorneys; Adam M.
Smith, Laura A. Brady, and Michael E. Hrinewski, of
counsel and on the briefs).

JUSTICE PATTERSON delivered the opinion of the Court.

This insurance coverage dispute arises from an insurer's denial of coverage based on an exclusion set forth in an insurance policy it issued to a limited liability company. The insured alleges that by virtue of its refusal to participate in a settlement of the underlying claims, the insurer forfeited its right to rely on the exclusion under Fireman's Fund Insurance Co. v. Security Insurance Co., 72 N.J. 63, 69-79 (1976), and that the insurer is estopped from disclaiming coverage in accordance with Griggs v. Bertram, 88 N.J. 347, 355-64 (1982). The insurer counters that because the exclusion in the policy barred coverage for the underlying claims, it had no obligation to indemnify or defend the insured or participate in the settlement, and that neither forfeiture nor estoppel applies in this matter.

The trial court granted partial summary judgment to the insured and denied the insurer's motion for summary judgment, holding that the insurer forfeited its right to rely on the exclusion by unreasonably withholding consent to the settlement. The Appellate Division reversed, ruling that because the exclusion in the policy precludes coverage for the underlying actions, the insurer had no obligation to consent to the settlement or indemnify the insured for any share of that settlement. Mist Pharms., LLC v. Berkley Ins. Co., 479 N.J. Super. 126, 137-43 (App. Div. 2024).

For the reasons that follow, we concur with the Appellate Division that the claims asserted in the underlying actions fall squarely within the disputed exclusion, that the insurer properly reserved its rights with respect to that exclusion in its communications with the insured, and that the insurer had the right to refuse to contribute to the settlement under the circumstances of this case. We therefore affirm as modified the Appellate Division's judgment.

I.

A.

On April 21, 2014, defendant Berkley Insurance Company (Berkley) issued a Directors and Officers insurance policy to plaintiff Mist Pharmaceuticals, LLC. Berkley's policy was a claims-made policy in effect for a period commencing on April 8, 2014, and ending on November 30, 2015. Mist Pharmaceuticals was an Insured Entity under the policy terms.

The policy defined an "Insured Person" to denote "any past, present or future duly elected or appointed director or officer of an Insured Entity," or "any past, present or future duly elected or appointed member of the board of managers, member of the management committee, or equivalent executive of an Insured Entity if organized as a limited liability company." It is undisputed that Joseph Krivulka, Chair of Mist Pharmaceuticals' Board of Directors and a

3

member and manager of that entity, was an Insured Person in that capacity, subject to exclusions and other policy terms.

The policy provided that Berkley

> shall pay on behalf of the Insured Persons all Loss arising from any Claim first made against the Insured Persons during the Policy Period and reported to the Insurer in writing during the Policy Period or within 90 days thereafter, for any actual or alleged Wrongful Act, except and to the extent that the Insured Entity has indemnified the Insured Persons.

The policy defined a "Wrongful Act" to mean

> 1. with respect to the Insured Persons, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Insured Persons in their respective capacities as such, or any matter claimed against them by reason of their status as Insured Persons, or any matter claimed against them arising out of their serving as a director, officer, trustee or governor of an Outside Entity[1] in such capacities, but only if such service is at the specific request or direction of the Insured Entity, or

> 2. with respect to an Insured Entity, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Insured Entity.

---

[1] The policy term "Outside Entity" is defined as "a nonprofit organization, or any other entity, partnership, joint venture or other organization listed by endorsement to this Policy." Neither party to this action claims that any entity meeting that definition was insured under the policy at issue in this appeal.

The policy defined "Loss" to mean "Damages and Costs of Defense." It addressed the insurer's right and duty to defend:

> The Insurer shall have the right and the duty to defend any Claim for Damages which are covered by this Policy. The Insurer shall have the right to select defense counsel. The Insurer has no obligation to provide Costs of Defense for any Claim for Damages not covered by this Policy.

The policy contained several exclusions, one of which is the capacity exclusion at the center of this coverage dispute. Under the capacity exclusion,

> [i]n addition to the Exclusions listed in section IV. of the Common Policy Terms and Conditions Section of this Policy, the Insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured:
>
> . . . .
>
> G. based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any Wrongful Act of an Insured Person serving in their capacity as director, officer, trustee, employee, member or governor of any other entity other than an Insured Entity or an Outside Entity, or by reason of their status as director, officer, trustee, employee, member or governor of such other entity[.]

The policy addressed the obligations of the insurer and insured with respect to the settlement of an underlying action:

> An Insured shall not admit or assume liability, enter into any settlement agreement, make any offer of settlement or compromise, . . . or incur Costs of

5

Defense without the Insurer's prior written consent. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to full information and all particulars it may request in order to reach a decision regarding such consent. Any Loss incurred or settlements agreed to prior to the Insurer giving its consent shall not be covered hereunder.

The policy limit was $2,000,000.

B.

The coverage dispute now before the Court arose from two underlying actions: CelestialRX Investments, LLC v. Krivulka (the Delaware Action), filed in the Court of Chancery in the State of Delaware on November 20, 2015; and CelestialRX Investments, LLC v. Estate of Joseph J. Krivulka (the New Jersey Action), filed in the Chancery Division on April 12, 2019, during the pendency of this coverage litigation.[2]

The plaintiffs in the Delaware Action were two LLCs formed and managed by Sandeep Laumas: CelestialRX Investments LLC (CelestialRX) and Krittaka Life Sciences, LLC (Krittaka). The focus of their allegations was

---

[2] We summarize the claims asserted in the underlying actions based on the original and amended complaints filed in the Delaware Action and the second amended complaint filed in the New Jersey Action. Krivulka, Mist Pharmaceuticals, and other defendants disputed many of the allegations in those actions and denied all wrongdoing. Because the Delaware and New Jersey actions settled prior to trial, no factfinder determined the validity of the claims asserted in either matter.

6

Akrimax Pharmaceuticals, LLC, which was formed in 2007 by Krivulka and his business associate, Leonard Mazur. CelestialRX and Krittaka alleged that Krivulka allowed CelestialRX to become a member of Akrimax with forty-nine percent of the voting units, in consideration for Laumas's recruitment of a substantial investor. They contended that Krivulka, through another entity he owned, maintained complete control of Akrimax.

According to CelestialRX and Krittaka, Akrimax acquired the infrastructure, resources, and expertise to promote, market, sell, distribute and warehouse pharmaceutical products, and was able to secure pharmaceutical licenses through a series of agreements with pharmaceutical companies with the stated intent of maximizing the value of those licenses and "generat[ing] gain for its members." They alleged that Krivulka undermined that objective by diverting income and resources from Akrimax -- partly owned by CelestialRX -- to "paper entities" that had "no real facilities or infrastructure themselves," but were owned and controlled by Krivulka and/or his business associates.[3] Mist Pharmaceuticals, one of the alleged "paper entities," was the only defendant entity that Berkley insured.

_____

[3] In addition to Mist Pharmaceuticals, the Krivulka-owned or operated entities named in the Delaware Action were JJK Partners, LLC; Mist Acquisition, LLC; Mist Partners, LLC; Cranford Pharmaceuticals, LLC; Cranford Therapeutics, LLC; Holmdel Therapeutics, LLC; JAK Investment Partners, LLC; and Holmdel Pharmaceuticals, LP. LMazur Associates, JV, a joint

7

CelestialRX and Krittaka contended that Krivulka developed a "scheme" by which

> (i) he would acquire rights [to pharmaceutical products] at a low price; (ii) he would use Akrimax to develop the products and appreciate their value; (iii) he would then sell high; and (iv) to maximize his own personal gain, he would make sure one way or another that Akrimax did not have or did not retain any rights to a product before it was sold.

CelestialRX and Krittaka further alleged that through a series of transactions undisclosed at the time to Laumas, "the use of Akrimax's infrastructure was thus pledged in acquiring product rights irrespective of whether Akrimax received any rights or benefit." They contended that Krivulka accomplished "the fourth prong of his scheme" by "diverting opportunities to acquire product rights from Akrimax" in favor of companies he or Mazur "controlled and owned," thus giving Akrimax "rights that were limited or easily terminated for additional fees" and imposing on Akrimax liabilities it would not have incurred had it been allowed to acquire the rights directly "free from Krivulka's self-dealing." According to CelestialRX and Krittaka, Krivulka "has stood and stands on both sides of all of the improper transfers and fees charged to Akrimax."

---

venture owned and controlled by Mazur, and JAK Investments, LLC were also named as defendants in the Delaware Action.

In the Delaware Action, Mist Pharmaceuticals was alleged to have played a role in an aspect of Krivulka's diversion scheme. CelestialRX and Krittaka claimed that Krivulka formed Mist Pharmaceuticals in October 2009, just as Akrimax was finalizing an agreement to acquire the distribution rights to a pharmaceutical product. Providing few details about Mist Pharmaceuticals' alleged conduct, they generally claimed that Krivulka caused Akrimax and Mist Pharmaceuticals to enter into an agreement which imposed substantial burdens on Akrimax and gave Mist Pharmaceuticals the right to collect royalties and terminate Akrimax's distribution license -- a right it later exercised.

In the Delaware Action, CelestialRX and Krittaka asserted direct and derivative claims for an accounting; breach of fiduciary duty; aiding and abetting breach of fiduciary duty; waste; conversion, fraud, and fraudulent inducement; civil conspiracy; unjust enrichment; breach of contract claims related to several agreements; breach of the implied covenant of good faith and fair dealing; majority oppression; breach of restrictive covenants; and tortious interference with contract.

9

In the New Jersey Action, filed after Krivulka's death on February 17, 2018, CelestialRX asserted claims individually and derivatively on behalf of Akrimax and Laumas.[4]

Like its claims in the Delaware Action, CelestialRX's claims against Mist Pharmaceuticals in the New Jersey Action emanated from Krivulka's alleged scheme to deprive Akrimax of its legitimately acquired rights to pharmaceutical products and royalties and other compensation to which Akrimax was entitled.

Elaborating on the allegations in the Delaware Action regarding Mist Pharmaceuticals, CelestialRX alleged that Krivulka was Mist Pharmaceuticals' controlling member, the Chair of its Board of Directors, and its manager; that Mist Pharmaceuticals' members were also officers, employees, or attorneys of Akrimax; and that Mist Pharmaceuticals' officers were also members, directors, officers or employees of Akrimax. It claimed that Mist Pharmaceuticals and other "non-Akrimax" entities controlled by Krivulka derived "substantial, and in some cases all, revenues from related party

---

[4] In the New Jersey Action, CelestialRX asserted claims against the entities named in the Delaware Action, except Akrimax, as well as four additional entities: JAM Investment Partners; Prenzamax, LLC; AK Air II; and KFE, LLC. CelestialRX also named as defendants Krivulka's estate and the estate's executors and beneficiaries, seeking to enjoin any distribution of estate assets while the litigation remained pending.

transactions with Akrimax." CelestialRX alleged that Krivulka took "improper actions" for his own personal gain and for the benefit of the "competing entity defendants," including Mist Pharmaceuticals, at the expense of CelestialRX and Akrimax. It provided further details on the transaction between Akrimax and Mist Pharmaceuticals, described in the Delaware Complaint, that allegedly deprived Akrimax of distribution rights it had acquired.

In the New Jersey Action, CelestialRX asserted claims for waste; conversion; unjust enrichment; civil conspiracy; civil racketeering; tortious interference with contract; tortious interference with prospective economic advantage; aiding and abetting breach of fiduciary duty; fraud or fraudulent inducement; aiding and abetting fraud or fraudulent inducement; and fraudulent transfer. It sought damages and other relief against the defendant entities.

C.

After the filing of the Delaware Action, Krivulka, Mist Acquisition, Mist Partners, Mist Pharmaceuticals, JAK Investment Partners, JJK Partners, Cranford Therapeutics, LLC, and Holmdel Therapeutics, LLC, jointly retained defense counsel to represent them.

On December 8, 2015, Mist Pharmaceuticals filed a claim under its Berkley policy, seeking coverage for the Delaware Action. The same day,

11

Berkley acknowledged the claim, reserving "all rights under the Policy, at law, and in equity, including, but not limited to, the right to raise Policy terms and conditions as defenses to coverage as may be appropriate in light of additional information received by us."

By letter dated March 9, 2016, Berkley sent to Mist Pharmaceuticals a preliminary coverage evaluation for the Delaware Action. After noting the many claims in the Delaware Action against defendants it did not insure, Berkley stated its understanding that "Krivulka is the founder and chairman of Mist Pharma," and that "none of the entity defendants are subsidiaries of Mist Pharma."

Berkley noted that Mist Pharmaceuticals and Krivulka were "the only policy insureds named in the complaint" and stated that coverage for Krivulka was limited under the policy terms to "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act in his capacity as the chairman of Mist Pharma." Berkley stated that coverage was not available "for Krivulka for allegations pertaining to his roles with Mist Acquisition, Mist Partners, Akrimax, or any other entity."

Berkley reserved its rights under the capacity exclusion, setting forth the text of that exclusion in its letter to Mist Pharmaceuticals. It reiterated that nothing in its letter "should be construed as a waiver, modification or estoppel

12

of any rights or defenses" under "the terms of the policy and any applicable insurance law and each of those rights and defenses remain expressly reserved."

With respect to the attorneys' fees charged by counsel jointly retained to represent Krivulka, Mist Pharmaceuticals, and six uninsured entities that Krivulka controlled, Berkley observed that the allegations pertained almost exclusively to "the transfer and/or acquisition" of a pharmaceutical license from Akrimax to Mist Acquisition, an entity that it did not insure. It contended that the allegations against Mist Pharmaceuticals and Krivulka in his capacity as a Mist Pharmaceuticals director "are minimal and ancillary." Berkley agreed to reimburse Mist Pharmaceuticals for ten percent of legal fees already incurred and "to pay 10% of the reasonable legal fees moving forward."

In the months that followed, Berkley repeatedly requested that Mist Pharmaceuticals produce a liability analysis and other information regarding the Delaware Action. On July 6, 2017, Mist Pharmaceuticals' insurance broker advised Berkley that it understood "nothing substantive" had occurred in the litigation but that the parties to the Delaware Action had agreed to a mediation.

On July 21, 2017, Berkley sent a supplemental coverage evaluation to Mist Pharmaceuticals.[5] It asserted a right to deny coverage, contending that the underlying allegations were known to Mist Pharmaceuticals in 2013, before the start of the policy period, and no insurance claim was submitted during the policy period. Berkley restated its reservation of rights based on the capacity exclusion, among other provisions, and again set forth the full text of that exclusion in its letter. It also reiterated the reservation of rights in other correspondence.

By letter dated August 4, 2017, Berkley withdrew "its participation in the defense" of Mist Pharmaceuticals and Krivulka in the Delaware Action, "effective immediately," based on its contention that CelestialRX's claim against Mist Pharmaceuticals arose prior to the policy period. It reiterated its prior reservation of rights.

Berkley advised Mist Pharmaceuticals that it would not participate in the scheduled mediation. The mediation was unsuccessful, and the Delaware Action remained unresolved.

---

[5] Berkley complained in its July 21, 2017 coverage evaluation that it had not been apprised of the status of the Delaware Action since the previous November, when a motion to dismiss had been pending. It stated that it had just been advised that the Delaware court had denied in part the motion six months earlier and that the parties had then agreed to mediate the matter. Berkley renewed its request for a substantive liability analysis regarding the claims against Mist Pharmaceuticals.

II.

A.

1.

On September 18, 2017, Mist Pharmaceuticals filed this coverage action. It contended that Berkley had taken unjustified and inconsistent positions by paying ten percent of the defense costs for nearly a year but then denying coverage, terminating its contribution to defense costs, and declining to participate further in the defense prior to the mediation.

Mist Pharmaceuticals asserted claims for breach of the terms of its policy based on Berkley's refusal to pay defense costs; a declaratory judgment that Berkley had a duty to defend; a declaratory judgment that Berkley had a duty to indemnify; bad faith; estoppel based on Berkley's alleged failure to timely deny coverage; and estoppel based on Berkley's alleged failure to inform the insureds of their right to accept or reject Berkley's offer of a defense. Mist Pharmaceuticals sought compensatory, consequential and punitive damages, a declaratory judgment, attorneys' fees, and costs.

In its answer to the coverage complaint dated November 27, 2017, Berkley asserted twenty-four defenses, including a defense based on the language of the capacity exclusion:

> Coverage for CelestialRX's claims against Mist
> Pharma is barred to the extent the allegations in the

15

> Underlying Action are based upon, arise out of, directly or indirectly result from or in consequence of, or in any way involved a 'Wrongful Act' of an 'Insured Person' serving in their capacity as a director, officer, trustee, employee, member or governor of any other entity other than an 'Insured Entity' or an 'Outside Entity,' or by reason of their status as a director, officer, trustee, employee, member or governor of such other entity.

Berkley filed a counterclaim, seeking "reimbursement, repayment, and restitution" of the legal fees it had paid to defend the Delaware Action. It claimed that Mist Pharmaceuticals' "failure to comply with Berkley's reporting requirements and to respond to Berkley's reasonable information requests" had hampered the investigation of the claim and compelled Berkley to pay defense costs for a claim that its policy did not cover.

Pursuant to orders entered by the trial court, the parties conducted discovery. Mist Pharmaceuticals produced more than 12,000 pages of discovery focused on the allegations in the Delaware Action, including transcripts of the depositions of Krivulka, Mazur, and Laumas taken in that action.

Mist Pharmaceuticals moved for partial summary judgment, seeking an order requiring Berkley to defend it and Krivulka in the Delaware action subject to a reservation of rights. Berkley cross-moved for summary judgment on the ground that the underlying claims were known to Mist Pharmaceuticals

16

prior to the policy period. In its cross-motion for summary judgment, Berkley did not rely on the capacity exclusion.

The trial court granted Mist Pharmaceuticals' motion, holding that Berkley had a duty to defend Mist Pharmaceuticals in the Delaware Action. The court denied Berkley's cross-motion, rejecting Berkley's argument regarding the timing of the claim. The Appellate Division denied Berkley's motion for leave to appeal. The trial court stayed the coverage litigation.

2.

While the coverage matter was pending before the trial court, Mist Pharmaceuticals repeatedly requested that Berkley participate in the negotiation of a global settlement among the parties to the Delaware and New Jersey Actions. By letter dated October 29, 2019, Mist Pharmaceuticals demanded that Berkley "be prepared to contribute the entire and remaining limit of the Policy to a settlement."

On November 1, 2019, Berkley declined Mist Pharmaceuticals' request, reiterating that it did not believe it "owe[d] any coverage obligation." Berkley also contended that Mist Pharmaceuticals had failed to provide it "with current information as to settlement demands, claim valuation, liability assessment, defense counsel reports, or proposals regarding the allocation of liability on

17

behalf of the various parties," and repeated its demand for defense counsel's analysis of Mist Pharmaceuticals' exposure, among other documents.

Mist Pharmaceuticals then requested that Berkley waive its rights under the policy's "consent to settle" provision and agree to a mediation of the coverage issue. Berkley reiterated its position that Mist Pharmaceuticals had "sought the tender of the full limits of the Berkley policy on days' notice" without producing documents addressing "the actual issue of the share of liability" facing Mist Pharmaceuticals and Krivulka "in his role as a director or officer of Mist Pharmaceuticals" in the underlying actions. Berkley again reserved its rights and confirmed that it did not waive any defenses, terms, conditions, exclusions, endorsements, or definitions in its policy or at law. The mediation went forward, but the coverage dispute was not resolved.

On June 23, 2020, the parties to the Delaware and New Jersey Actions agreed to a global settlement of those matters. Berkley did not participate in the settlement negotiations.

Under the settlement, certain defendants in the underlying actions paid a total of $12 million to CelestialRX, twenty-five percent of which was allocated to Berkley's insureds, Mist Pharmaceuticals and Krivulka in his capacity as the Chairman of Mist Pharmaceuticals' Board of Directors.

In the wake of the global settlement, Mist Pharmaceuticals again demanded that Berkley contribute its policy limits. Berkley declined, stating that it was committed to meaningful discussions of a contribution as long as those discussions reflected the specific exposure of Mist Pharmaceuticals and Krivulka in his capacity as a director of that entity. Berkley again reserved its rights and defenses.

In a risk assessment produced to Berkley, counsel for Mist Pharmaceuticals and Krivulka provided details regarding the twenty-five percent allocation to Mist Pharmaceuticals and Krivulka in his capacity as a Mist Pharmaceuticals director. Asked at his deposition whether the assessment of Krivulka's exposure included "his exposure based upon his status with Akrimax," Mist Pharmaceuticals' counsel responded, "in part, yes. Because he's making -- you know, these agreements are being entered into from two ends: Akrimax, which Joe controls, and these entities, which Joe controls."

3.

The parties cross-moved for summary judgment on the question whether Berkley had breached a duty under its policy to indemnify Mist Pharmaceuticals and contribute to the global settlement. Citing unresolved issues of material fact, the trial court denied both motions.

19

Mist Pharmaceuticals served a <u>Rule</u> 4:14-2(c) deposition notice for a corporate designee to testify on Berkley's behalf regarding its analysis of its alleged obligation to cover the underlying claims and the question of consent to the global settlement. A claims executive designated by Berkley in response to that notice testified that her analysis was based on the legal advice of Berkley's outside coverage counsel, as to which Berkley invoked the attorney-client privilege. After the deposition, Berkley served an affidavit signed by the corporate designee stating that Berkley refused to consent to the settlement of the underlying matters because it had received no supporting analysis from Mist Pharmaceuticals' defense counsel warranting the allocation of twenty-five percent of the settlement to Mist Pharmaceuticals. The trial court struck the corporate designee's affidavit on the grounds that it contravened her deposition testimony.

Mist Pharmaceuticals also moved for an order pursuant to <u>Rule</u> 4:42-2 granting reconsideration of the trial court's denial of its motion for partial summary judgment; an order vacating the portion of the trial court's prior opinion denying Mist Pharmaceuticals' motion for partial summary judgment; and an order pursuant to <u>Rule</u> 4:46-2(c) granting partial summary judgment to Mist Pharmaceuticals on the duty to indemnify. Berkley cross-moved for an order pursuant to <u>Rule</u> 4:42-2 granting reconsideration of the denial of

20

Berkley's summary judgment motion, and for an order pursuant to Rule 4:46-2(c) granting summary judgment to Berkley.

The trial court granted Mist Pharmaceuticals' motions and denied Berkley's cross-motions. The court bound Berkley to the corporate designee's testimony that she relied solely on coverage counsel's privileged analysis of the coverage claim. The trial court concluded, "in the absence of competent evidential facts to the contrary," that Berkley unreasonably withheld consent to the settlement.[6] The court relied on the potential that the defendants in the underlying claims would be subject to joint and several liability; Krivulka's "dominion and control" over Mist Pharmaceuticals; the royalty payments allegedly diverted from Akrimax to the Krivulka companies including Mist Pharmaceuticals; the impact of Akrimax's loss of those royalty payments on its ability to meet its obligations under other agreements; CelestialRX's claimed damages; defense counsel's reasonable estimate of the exposure; the fact that after five years of litigation in the underlying actions, no defendant had filed an answer; and the prospect of "millions of dollars in future defense costs" in

---

[6] The trial court declined to rely on the report of Berkley's expert on the allocation of the underlying claims. For reasons explained in the report, the expert viewed the twenty-five percent allocation of the settlement to Mist Pharmaceuticals to be unreasonable.

21

those actions. The trial court found that Berkley breached its obligations under the policy by unreasonably withholding consent to the settlement.

The trial court imposed "the ultimate burden of proving unreasonableness and bad faith by the insured" on Berkley, and found that it had failed to meet that burden. Citing Fireman's Fund, 72 N.J. at 71-73, the trial court reasoned that it "need not reach" the capacity exclusion because this Court "has held that a recalcitrant insurer that breaches its policy can no longer look to contractual defenses to avoid coverage." It concluded that "once the breach occurs and a reasonable, good-faith settlement is reached, the insurer may no longer challenge its coverage obligation."

The trial court entered final judgment for Mist Pharmaceuticals and against Berkley in the amount of $1,751,567.35, representing the remaining policy limit, and awarded Mist Pharmaceuticals $796,258.38 in legal fees.

B.

Berkley appealed (1) the trial court's grant of Mist Pharmaceuticals' two motions for partial summary judgment; (2) the trial court's grant of Mist Pharmaceuticals' motion for counsel fees; (3) the trial court's denial of Berkley's motion for reconsideration; (4) the trial court's denial of Berkley's motion for summary judgment; and (5) the trial court's final judgment. Mist Pharms., 479 N.J. Super. at 130.

22

The Appellate Division noted that the trial court's legal analysis "would have been better informed if it had first addressed the application of the policy's capacity exclusion." Id. at 138. Citing this Court's decision in Norman International, Inc. v. Admiral Insurance Co., 251 N.J. 538, 549-50 (2022), and other case law, the appellate court observed that "the loss alleged by [CelestialRX], the plaintiff in the underlying actions against Mist [Pharmaceuticals] and other non-insured entities, stemmed from Krivulka's self-dealing." Id. at 142. It held that when Krivulka committed the alleged acts at issue, he was "acting in his capacity as both a director of Akrimax and majority shareholder of Mist." Ibid. The Appellate Division viewed the "undisputed record" to demonstrate that

> Krivulka used his position as an Akrimax director to require that Akrimax guarantee to Mist certain obligations -- including over $28 million in royalties and distribution rights as well as a termination provision -- without consideration. It is undisputed that Krivulka acted in a dual capacity. The record, including the 12,000 pages of additional discovery, reveals nothing to change this fact. The loss claimed by Mist against Berkley's D&O policy arose from and could not have occurred but for Krivulka's conduct in his capacity as a director of Akrimax.
>
> [Ibid.]

The court noted that its "but for" analysis did not require it "to unpack the percentage of Krivulka's conduct attributable to his role as a

23

director/officer at Akrimax and compare it to the percentage of Krivulka's conduct attributable to his role as a director/officer at Mist [Pharmaceuticals]." Ibid. It concluded that Krivulka's conduct in both capacities triggered the capacity exclusion. Ibid.

The Appellate Division also addressed the trial court's holding that under this Court's decision in Fireman's Fund, 72 N.J. at 69-70, Berkley forfeited the right to rely on the capacity exclusion in the coverage action because it unreasonably refused to consent to the settlement. Mist Pharms., 479 N.J. Super. at 137-38.[7] It found two "material distinctions" between this appeal and Fireman's Fund: first, Berkley's assertion in this appeal that withholding consent to the settlement was reasonable given that the settlement "represented the separate interests of multiple entities not insured under the policy;" and second, Berkley's repeated reservation of its rights under the capacity exclusion "from its earliest communications with Mist regarding the claim." Id. at 138.

Noting that Berkley had relied on the timing of the claim, not the capacity exclusion, when it moved for partial summary judgment on the duty

---

[7] The Appellate Division did not address Mist Pharmaceuticals' argument that Berkley was estopped from invoking the capacity exclusion based on this Court's holding in Griggs, 88 N.J. at 367. See Mist Pharms., 479 N.J. Super. at 137-43.

24

to defend, the Appellate Division upheld the trial court's order requiring Berkley to pay Mist Pharmaceuticals' legal fees in the underlying actions up to July 7, 2021, when Berkley first argued before the trial court that the capacity exclusion barred coverage. Id. at 142-43.

The Appellate Division reversed the trial court's judgment against Berkley and the court's orders denying Berkley's motion for summary judgment and granting summary judgment to Mist Pharmaceuticals. Id. at 143. It dismissed Mist Pharmaceuticals' coverage complaint and remanded the matter to the trial court for the entry of judgment in Berkley's favor and for a determination of reasonable counsel fees incurred to Mist Pharmaceuticals up to July 7, 2021. Ibid.

### C.

We granted Mist Pharmaceuticals' petition for certification. 260 N.J. 92 (2025).

### III.

### A.

Mist Pharmaceuticals argues that Berkley violated its duty under Griggs to promptly inform its insured that it intended to disclaim coverage or of the possibility that it would deny or question coverage, because it was aware since 2015 that the allegations against Mist Pharmaceuticals in the underlying

actions raised a capacity issue. It asserts that in accordance with <u>Griggs</u>, Berkley should be estopped from invoking the capacity exclusion. Mist Pharmaceuticals contends that Berkley should be held to have forfeited its right to rely on the capacity exclusion under <u>Fireman's Fund</u>. It urges the Court not to reach the question whether the capacity exclusion applies, or, in the alternative, to find the exclusion inapplicable on the ground that the allegations against Mist Pharmaceuticals in the underlying actions are disputed.

B.

Berkley argues that because all of CelestialRX's allegations concerned Krivulka's alleged self-dealing as a director of Akrimax, the capacity exclusion plainly bars coverage for the claims asserted in the Delaware and New Jersey Actions. It contends that Mist Pharmaceuticals failed to raise an estoppel argument before the trial court and that it is not estopped from invoking the exclusion because it repeatedly reserved its right to rely on the exclusion. Berkley asserts that it reasonably withheld consent to the settlement because its policy did not cover Mist Pharmaceuticals or Krivulka for the underlying allegations, and adds that this Court did not hold in <u>Fireman's Fund</u> that an insurer forfeits its right to assert applicable policy exclusions by declining to consent to a settlement.

26

IV.

A.

An appellate court reviews a trial court's grant or denial of summary judgment de novo, applying the same standard that governs the trial court's determination. In re Est. of Jones, 259 N.J. 584, 594 (2025). "The appellate court considers 'whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.'" Ibid. (quoting Padilla v. Young Il An, 257 N.J. 540, 547 (2024)); see also R. 4:46-2(c). "A trial court's interpretation of an insurance policy's terms is a legal determination, not a factual inquiry, and is accordingly reviewed de novo." AC Ocean Walk, LLC v. Am. Guar. & Liab. Ins. Co., 256 N.J. 294, 312 (2024).

B.

We first determine whether the capacity exclusion in the policy issued by Berkley to Mist Pharmaceuticals bars coverage for the claims asserted in the Delaware and New Jersey Actions.

"Insurance policies are reviewed using contract principles, and the 'agreement "will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled."'" Norman Int'l, 251 N.J. at

27

552 (quoting Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 525 (2012)). "'[A]n insurance policy should be interpreted according to its plain and ordinary meaning,' with any ambiguities 'resolved in favor of the insured.'" Rodriguez v. Shelbourne Spring, LLC, 259 N.J. 385, 395 (2024) (alteration in original) (quoting Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992)). Nonetheless, "a court should not . . . write a better policy for the insured than the one purchased." Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008).

"Exclusionary clauses are presumed valid if they are 'specific, plain, clear, prominent and not contrary to public policy.'" Mem'l Props., 210 N.J. at 528 (quoting Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 95 (1997)). "[C]ourts must be careful not to disregard the 'clear import and intent' of a policy's exclusion . . . ." Flomerfelt v. Cardiello, 202 N.J. 432, 442 (2010).

"'[I]n general, insurance policy exclusions must be narrowly construed; the burden is on the insurer to bring the case within the exclusion.'" Ibid. (quoting Am. Motorists Ins. Co. v. L-C-A Sales Co., 155 N.J. 29, 41 (1998)); accord AC Ocean Walk, LLC, 256 N.J. at 312. "If the terms used in an exclusionary clause are ambiguous, 'courts apply the meaning that supports coverage rather than the one that limits it.'" Mem'l Props., 210 N.J. at 528 (quoting Flomerfelt, 202 N.J. at 442). Nonetheless, "we do not suggest that

28

'any far-fetched interpretation of a policy exclusion will be sufficient to create an ambiguity requiring coverage.'" Flomerfelt, 202 N.J. at 442 (quoting Stafford v. T.H.E. Ins. Co., 309 N.J. Super. 97, 105 (App. Div. 1998)). "If the words used in an exclusionary clause are clear and unambiguous, 'a court should not engage in a strained construction to support the imposition of liability.'" Ibid. (quoting Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537 (1990)); accord Mem'l Props., 210 N.J. at 528.

This Court has recognized an important distinction between an exclusionary clause that applies only if the evidence supports a causal link between the excluded act and the loss alleged and an exclusionary clause that does not expressly require such a causal nexus in order to apply. See Norman Int'l, 251 N.J. at 552-54; Flomerfelt, 202 N.J. at 451-53.

In Flomerfelt, the policy at issue included a clause that excluded coverage for "bodily injury or property damage . . . [a]rising out of the use, sale, manufacture, delivery, transfer or possession by any person of a controlled substance(s)." 202 N.J. at 451. The plaintiff brought an action against the insured homeowners, alleging that she was injured due to an overdose of alcohol and drugs at a party held on their property and a delayed call to summon first responders. Id. at 439. The plaintiff had little recollection of the events, and the parties contested the cause of her injuries.

29

Id. at 436-41. The trial court denied the insurer's summary judgment motion and granted the defendant homeowners' motion for a defense and indemnity. Id. at 440. The Appellate Division reversed, construing the language of the exclusionary clause to bar coverage because the experts' opinions in the personal injury case tied the plaintiff's injuries to both drugs and alcohol. Ibid. The homeowners appealed.

This Court noted that the exclusion was limited to claims "arising out of" the "use, sale, manufacture, delivery, transfer or possession" of a controlled substance, thereby requiring a causal nexus, and that the record did not establish whether drugs, alcohol, or some other factor had caused the injuries. Id. at 451, 458. It was therefore unable to "resolve the question of the insurer's duty to indemnify" under a summary judgment standard. Ibid. The Court concluded, however, that there were "potentially covered claims" in the matter giving rise to a duty to defend, and reversed the Appellate Division's judgment. Ibid.

This Court's decision in Norman International presents a contrasting setting. There, the exclusionary clause in a commercial general liability policy stated that the policy did not apply to several categories of injury "actually or allegedly arising out of, related to, caused by, contributed to by, or in any way connected with . . . [a]ny operations or activities performed by or on behalf of

30

any insured" in certain New York counties enumerated on a schedule to the policy. 251 N.J. at 546. The insured, a company that sold window covering products to national retailers, sought a defense in a personal injury lawsuit brought by an employee of a retailer in one of the excluded counties who alleged that she was injured by a cutting machine supplied by the insured company. Id. at 543-45. The trial court granted the insurer's motion for summary judgment, but the Appellate Division reversed, holding that the insured's "'limited activities and operations ha[d] no causal relationship to the causes of action or allegations.'" Id. at 547.

This Court reversed the Appellate Division's judgment. Id. at 549-56. It viewed the exclusionary clause's "broad and unambiguous language" to "make[] clear that a causal relationship between [the insured's] conduct and plaintiff's injuries is not required in order for the exclusionary clause to apply." Id. at 543. The Court observed that "[b]ecause the exclusion test is disjunctive, each phrase in the exclusion must be considered separately, any one of which would be sufficient to trigger the exclusion." Id. at 555. It concluded that "any claim 'in any way connected with' [the insured's] operations or activities" in an excluded New York county "is not covered under the policy." Id. at 543. Accordingly, the Court declined to impose a duty to defend.

31

We view the exclusionary clause in this appeal to be distinct from the clause at issue in <u>Flomerfelt</u>, which required a causal nexus between the excluded activity and the alleged harm. <u>See</u> 202 N.J. at 447-58. It is, in contrast, closely analogous to the exclusion at issue in <u>Norman International</u>, in which the term "arising out of" was connected by the disjunctive "or" to more expansive terms such as "related to" and "in any way connected with" operations or activities in an excluded county. <u>See</u> 251 N.J. at 549-56.

Here, as in <u>Norman International</u>, the disjunctive "or" means that each term in the exclusion is alone sufficient to bar coverage. <u>See</u> <u>id.</u> at 555. Consequently, the exclusionary clause at issue here does not turn on a causal nexus between the excluded activities and the harm alleged. To the contrary, it applies "to the extent the allegations" in the underlying actions "in any way" involved "any Wrongful Act of an Insured Person serving in their capacity as director, officer, trustee, employee, member or governor" of any entity other than "an Insured Entity or an Outside Entity," or "by reason of their status as director, officer, trustee, employee, member or governor of such other entity."[8]

---

[8] Citing an unpublished Eleventh Circuit decision, the Appellate Division held that the capacity exclusion at issue here requires a court to determine whether Krivulka's actions as a member and manager of Akrimax caused the alleged harm, using a standard of "but for" causation. <u>Mist Pharms.</u>, 479 N.J. Super. at 142. In the specific setting of this appeal, we respectfully disagree; here, the exclusion's broad language is satisfied without any finding that Krivulka's acts and omissions as an Akrimax director caused the harm alleged by CelestialRX.

The policy, in turn, defines "Wrongful Act" to include "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act" by an insured person in that person's capacity as a "director, officer, trustee, employee, member or governor" of an uninsured entity.

Here, it is undisputed that neither Akrimax nor any other defendant entity except Mist Pharmaceuticals constitutes an Insured Entity or an Outside Entity under the policy terms. Accordingly, the capacity exclusion applies "to the extent" that the allegations in the Delaware and New Jersey Actions "directly or indirectly result[] from" or "in any way involved" a "wrongful act" by Krivulka "serving in [his] capacity" as a director, member, or manager of Akrimax, or "by reason of [his] status as" a director, member, or manager of Akrimax.

As the complaints in the Delaware and New Jersey Actions make clear, the claims asserted focused on Krivulka's alleged acts and omissions as a director, member, and/or manager of Akrimax.[9] The factual allegations

_____

We do not reach the question whether causation, in a case in which a causal nexus is essential to the application of a capacity exclusion, should be assessed under a "but for" causation standard.

[9] Applying the exclusionary clause, the Appellate Division properly premised its decision on the allegations of the Delaware and New Jersey complaints, noting that the discovery produced in this action did not alter its conclusion that the claims fell within the exclusion. See Mist Pharms., 479 N.J. Super. at 138-42. This Court has recognized that "[t]here are times . . . when comparing

33

involve more than a dozen Krivulka-owned or controlled entities, but share a common feature:  Krivulka's role as Akrimax's member and manager is front and center in all.  As Krivulka's alleged manipulation of Akrimax played a critical role in the underlying claims as a whole, that claimed misconduct is at the core of the few allegations in which Mist Pharmaceuticals was specifically named.  There is no allegation in either of the underlying actions against Mist Pharmaceuticals -- or against Krivulka as a director, member, or manager of Mist Pharmaceuticals -- that is unrelated to Krivulka's capacity as a director, member, and manager of Akrimax, an entity uninsured under Berkley's policy. Accordingly, the allegations asserted in the underlying actions clearly fall within the scope of the capacity exclusion.

We respond to the dissent's argument for an alternative interpretation of the capacity exclusion.

---

the causes of action in the complaint to the exclusionary clause will not provide an answer as to whether there is a potentially covered claim," a situation that "occurs 'when coverage, i.e. the duty to pay, depends upon a factual issue which will not be resolved by the trial.'"  Norman Int'l, 251 N.J. at 550 (quoting Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 388 (1970)).  That principle, however, does not apply in this matter, in which the question of coverage is not driven by a factual issue that would have remained unresolved had the underlying actions been tried.

The dissent's position is that the exclusion precludes coverage for wrongful actions Krivulka committed in an uninsured capacity, but does not preclude coverage for wrongful actions Krivulka committed in an insured capacity. Post at ___ (slip op. at 4-5). The dissent claims that the capacity exclusion excludes some, but not all, coverage for the claims alleged in the underlying actions, and that some of those claims are not within the exclusion's description of claims that the policy does not cover. Ibid.

The plain text of the capacity exclusion cannot be reconciled with the construction urged by the dissent. That exclusion applies to any claim "in any way involving" any wrongful act by Krivulka in his "capacity as director, officer, trustee, employee, member or governor of any other entity other than an Insured Entity or an Outside Entity," or by reason of his status "as director, officer, trustee, employee, member or governor of such other entity."[10]

---

[10] The dissent argues that we should not consider the phrase "in any way involving" in "isolation from the rest of the Policy." Post at ___ n.6 (slip op. at 32 n.6). Because the disjunctive "or" separates the exclusion's alternative phrases, however, any one of those phrases, considered alone, is "sufficient to trigger the exclusion." See Norman Int'l, 251 N.J. at 547. Consequently, no matter what the rest of the policy states, the exclusion bars coverage for any claim "in any way involving" "any Wrongful Act" by Krivulka "serving in their capacity as director, officer, trustee, employee, member or governor" of Akrimax, Mist Acquisition, Mist Partners, or any other entity that Berkley did not insure.

35

It clearly encompasses any cause of action premised on Krivulka's alleged misuse of his authority over multiple entities in which he was a director, officer, or member -- whether that claim involved Mist Pharmaceuticals and the uninsured Akrimax, Mist Pharmaceuticals and the uninsured Mist Acquisition, Mist Pharmaceuticals and the uninsured Mist Partners, or Mist Pharmaceuticals and multiple uninsured entities in combination.

The dissent cites claims in the underlying actions that it views to be outside the scope of the capacity agreement. We respectfully disagree.

The dissent first relies on an allegation in the New Jersey Complaint that Krivulka "entered into agreements with Akrimax 'to shift valuable assets to . . . Mist Pharma[] for no consideration,'" thus allowing Mist Pharmaceuticals to "terminate and retake" distribution rights to a pharmaceutical product. Post at ___ (slip op. at 28-29) (alterations in original). That claim certainly relates to Krivulka's role at Mist Pharmaceuticals, as the dissent observes. It is, however, an allegation of misconduct by Krivulka in the management of Akrimax as well. CelestialRX alleged that Krivulka secretly and unlawfully directed Akrimax to agree to contract provisions, favorable to Mist Pharmaceuticals and Mist Acquisition, that deprived Akrimax of valuable

36

rights.[11] Thus, it is unquestionably a claim "in any way involving" alleged wrongful acts by Krivulka in his capacity as a "director," "officer" and "member" of not one but two uninsured entities, Akrimax and Mist Acquisition.

The dissent next invokes an allegation in the New Jersey Action that Krivulka sent Akrimax a letter "on behalf of several companies, including Mist Pharma," exercising their right to terminate Akrimax's distribution rights. Post at ____ (slip op. at 29). That allegation implicates a claimed wrongful act by Krivulka in his capacity as a director, officer, and member of Mist Pharmaceuticals -- his direction to Mist Pharmaceuticals to send the letter terminating Akrimax's rights. It is premised, however, on an alleged wrongful act by Krivulka is his capacity as a director, officer, and member of Akrimax. CelestialRX contended that Akrimax was seriously damaged when Krivulka compelled it to agree to contractual provisions directly adverse to its interests but favorable to other companies within his control. In addition, the allegation directly relates to Krivulka's role in two other uninsured entities, Mist Partners

---

[11] Referring to Akrimax's agreement -- entered into at Krivulka's behest -- that its rights to two pharmaceutical products could be terminated on thirty days' notice, CelestialRX alleged that those termination provisions "existed solely to provide Krivulka with hegemonic power over Akrimax" and constituted "a mechanism to shift valuable assets to Mist Acquisition and Mist Pharmaceuticals for no consideration."

and Mist Acquisition. The claim cited by the dissent is indisputably an allegation "in any way involving" alleged wrongful acts by Krivulka in his separate capacity as a director, officer, and/or member of not one but three uninsured entities.

The final allegation on which the dissent relies is CelestialRX's claim in the New Jersey Action that all defendants, including Mist Pharmaceuticals, "aided and abetted Krivulka in breaching his fiduciary duties owed to Akrimax and Celestial[RX], committed civil racketeering, and participated in a civil conspiracy." Post at ____ (slip op. at 29). In this allegation, CelestialRX asserts concerted misconduct by Krivulka in his capacity as a director, officer, and/or member of more than a dozen uninsured entities. It is clearly a claim within the capacity exclusion's broad parameters.

In short, we view every claim in the underlying actions to fit within the capacity exclusion's expansive terms.

Mist Pharmaceuticals and Berkley could have agreed to a policy with the narrow capacity exclusion that the dissent envisions: an exclusion that has no effect on claims premised on a director or officer's misconduct in a "dual capacity" for insured and uninsured entities. Such a policy, however, was neither issued by Berkley nor paid for by Mist Pharmaceuticals. We apply the policy terms to which the parties agreed.

38

We do not view the dissent's construction of the capacity exclusion to constitute a "fair interpretation" of the policy language that would give rise to an ambiguity. See Flomerfelt, 202 N.J. at 442.[12] We respectfully decline to construe and apply the capacity exclusion in the manner advocated by the dissent.

We conclude that Berkley has met its burden to demonstrate that the exclusion bars coverage for the claims at issue here.

---

[12] The dissent cites cases from other jurisdictions, arguing that they support Mist Pharmaceuticals' construction of the capacity exclusion in this case. Post at ___ (slip op. at 23-25). None of those cases involve capacity exclusion language analogous to the policy language at issue here. See Zayed v. Arch Ins. Co., 932 F. Supp. 2d 956, 970-71 (D. Minn. 2013) (interpreting capacity exclusion barring claims "arising from, based upon, or attributable to any Insured person serving as a director, officer . . . or equivalent executive or as an employee of any entity other than an Insured Organization"); Abrams v. Allied World Assurance Co. Inc., 657 F. Supp. 3d 1280, 1284 (N.D. Cal. 2023) (construing a capacity exclusion excluding from coverage "any loss 'alleging, arising out of, based upon or attributable to any actual or alleged act or omission of any Insured Person serving in any capacity other than as an Executive'"). Two of the cases cited by the dissent do not involve capacity exclusions at all. See McAninch v. Wintermute, 491 F.3d 759, 762 nn.3, 4, 771-72 (8th Cir. 2007) (addressing a definition of "wrongful act" starkly different from that of the policy relevant here, and construing an exclusion barring coverage for claims for loss against the insured bank by any state or federal official agency); Grigg v. Aarrowcast, Inc., 909 N.W.2d 283, 185-86, 198 (Wis. Ct. App. 2018) (construing a policy that undisputedly covered alleged wrongful acts committed by the insured individual in his capacity as a director or officer of the insured corporation). The cases invoked by the dissent are not relevant to this appeal.

39

## C.

We next consider Mist Pharmaceuticals' argument that Berkley is precluded from asserting its rights under the capacity exclusion under this Court's decisions in Fireman's Fund, 72 N.J. at 69-79, and Griggs, 88 N.J. at 355-64.

Fireman's Fund arose from a dispute between an excess insurer and an insured law firm that was sued in two actions for legal malpractice. 72 N.J. at 67. It was undisputed that the primary insurer provided $50,000 in coverage, and the excess insurance policy issued by Fireman's Fund provided excess coverage up to $250,000. Ibid. The law firm settled the malpractice claims with the cooperation of the excess insurer but not the primary insurer, which refused to contribute its policy limit. Ibid. The law firm accordingly assigned its rights against the primary insurer to the excess insurer. Ibid. Given the primary insurer's clear obligation to provide coverage, the trial court found that it had acted in bad faith in failing to cooperate, a finding that the insurer did not dispute. Id. at 68. The trial court held that in those circumstances, "the insured may proceed to effectuate a reasonable good faith settlement for an amount in excess of the policy limits and, upon proof of the insurer's bad faith, may recover from it the amount of its policy limits" notwithstanding the

absence of a judgment against the insured.  Id. at 67.  The Appellate Division affirmed.  Ibid.

In that discrete setting -- in which the insurer had clearly breached its obligations under the policy and acted in bad faith -- this Court held that the insurer had forfeited its right to control the settlement of the underlying claims.  Id. at 68-73.  It noted that "[b]efore an insurance company will be heard to allege the breach of a contractual provision by plaintiff, the insurance company must be able to assert its own lack of any breach."  Id. at 71 (quoting Warren v. Emps.' Fire Ins. Co., 53 N.J. 308, 311-12 (1969)).  The Court observed that "[w]hile the right to control settlements reserved to insurers is an important and significant provision of the policy contract, it is a right which an insurer forfeits when it violates its own contractual obligation to the insured." Ibid. (citations omitted).  The Court noted that "implicit in the power . . . reserved to the insurer" to control the settlement was "an obligation that the insurer exercise its reserved power in good faith and with concern for the interests of the insured."  Id. at 74.

This Court therefore held that "[i]f the insurer delays unreasonably in investigating and dealing with a claim asserted against its insured," then "the insured may make a good faith reasonable settlement and then recover the settlement amount from the insurer" within the policy limits.  Id. at 73.  It

41

imposed the burden of proof as to the reasonableness of the settlement on the insured. Id. at 79. The Court considered the settlement in that case to be reasonable and entered into in good faith, and held that the excess insurer was entitled to recover against the primary insurer the amount of the policy limit. Id. at 66-67.

In Griggs, the defendant was involved in a fight with the plaintiff at a basketball game. 88 N.J. at 353. He provided his insurer with notice that a claim could be brought against him and informed the insurer's investigator that he had punched the plaintiff twice during the altercation. Ibid. Although the defendant's insurance policy excluded coverage for an intentional tort, the insurer "gave no indication that any potential claim or legal action arising from this incident would not be covered under the policy or that it would disclaim coverage in the event such a claim or action were brought." Ibid.

Seventeen months later, the plaintiff filed a complaint, which the defendant forwarded to the insurer. Id. at 353-54. The insurer disclaimed coverage based on the policy's intentional tort exclusion. Id. at 354. The parties settled, stipulating to the entry of a consent judgment in the plaintiff's favor for $9,000 but agreeing that the plaintiff had the right to pursue the defendant's insurer rather than the defendant himself. Ibid. The trial court entered judgment in that amount against the insurer, reasoning that "the

carrier's failure to notify [the insured] promptly of its intention to disclaim estopped it from denying coverage," and the Appellate Division affirmed.  Id. at 354-55.  The insurer appealed.  Id. at 355.

Noting court decisions that barred insurers from disclaiming coverage after initially defending insureds, this Court explained that an insurer "may be estopped [from disclaiming coverage] if it assumes control of a case prior to the filing of a complaint with knowledge of facts on which to disclaim coverage but without any reservation of the right later to do so."  Id. at 356. The Court reasoned that estoppel should also apply "where the insurer has neither assumed the actual control of a case nor undertaken the preparation of any defense on behalf of the insured" but "has failed for an unreasonable period of time to inform its insured of the possibility of a disclaimer of coverage, notwithstanding the insurer's early notification of a possible claim and awareness of grounds for disclaimer."  Id. at 357.

The Court viewed those factors to support a finding that the defendant was prejudiced by his insurer's conduct.  Id. at 363.  It held that "where, after timely notice, adequate opportunity to investigate a claim, and the knowledge of a basis for denying or questioning insurance coverage," an insurer "fails for an unreasonable time to inform the insured of a potential disclaimer," that insurer "is estopped from later denying coverage under the insurance policy in

43

the event a legal action is subsequently brought against its insured." Id. at 363-64.

In Griggs, the Court also considered whether -- given its refusal to participate in the settlement negotiations -- the insurer was required to pay the settlement amount notwithstanding a "no action" provision of the policy that prohibited "recovery unless there is a settlement entered into with the insurance carrier's participation or a judgment following an actual trial." Id. at 364. The Court invoked its holding regarding forfeiture in Fireman's Fund to find that the insurer, "estopped from denying coverage under the policy," was "similarly estopped from insisting on compliance with the 'no action' provision of the policy." Ibid. Distinguishing the burden of proof for the estoppel claim before it from that imposed under the forfeiture analysis of Fireman's Fund, however, the Court imposed a burden-shifting framework for determining whether a settlement is reasonable and has been reached in good faith. Id. at 367-68.

Neither Fireman's Fund nor Griggs stands for the proposition that an insurer is somehow barred from contesting its obligation to cover a given claim or from seeking to enforce an exclusion in its policy. See Griggs, 88 N.J. at 355-70; Fireman's Fund, 72 N.J. at 66-78. Indeed, in Griggs, the Court noted that "[t]he insured's reasonable expectation of protection of its interests

44

by the insurer can, of course, be dispelled by timely notice from the insurance carrier of a possible disclaimer of coverage." 88 N.J. at 362. Neither decision addressed a setting in which the insurer invoked an exclusion or provided a reservation of rights. See Griggs, 88 N.J. at 352-55; Fireman's Fund, 72 N.J. at 66-70.

As this Court stated in Passaic Valley Sewerage Commissioners v. St. Paul Fire & Marine Insurance Co., in which it deemed the insurer's three reservation-of-rights letters and three notices of policy implications to meet the mandate of Griggs, "[r]eservation of rights letters have long been regarded as proper defense mechanisms for insurance companies." 206 N.J. 596, 616 (2011). The Court held that "[b]y reserving rights and providing defense costs on covered claims, an insurer fulfills its defense obligations." Ibid. As the Court observed, "a good-faith challenge to coverage is not a breach of an obligation to defend." Id. at 617.

We do not view Fireman's Fund to support Mist Pharmaceuticals' argument in this appeal. The holding of Fireman's Fund derived from the undisputed fact that the primary insurer's policy covered the legal malpractice claims at issue and the trial court's uncontested finding that the insurer had acted in bad faith. See Fireman's Fund, 72 N.J. at 67-71. Here, in contrast, an exclusion applies. The policy issued by Berkley does not cover Mist

Pharmaceuticals for the claims asserted in the Delaware and New Jersey Actions. There is, accordingly, no basis for a finding that Berkley acted in bad faith, and indeed no such finding was made in this case. Under the terms of the policy, absent a covered claim, Berkley had no obligation to contribute its policy limit to the global settlement. Berkley did not forfeit any contractual right when it declined to participate in the settlement of what it determined -- correctly -- to be uncovered claims. Fireman's Fund is simply inapplicable to this appeal.

Nor is Mist Pharmaceuticals correct in asserting that the circumstances of this case warrant a finding of estoppel under Griggs. In Griggs, the Court required that an insurer, once aware of "grounds for questioning coverage," promptly advise its insured of "its intention to disclaim coverage" or "the possibility that coverage will be denied or questioned." 88 N.J. at 357. During the five years preceding the global settlement on June 23, 2020, Berkley repeatedly restated the full text of its capacity exclusion in correspondence with Mist Pharmaceuticals. It reserved its rights under that exclusion and other policy provisions in letters and emails no fewer than ten times. And Berkley advised Mist Pharmaceuticals at least six times that nothing in its correspondence should be construed as a waiver, modification, or estoppel of its rights, which included its right to rely on the capacity

46

exclusion set forth in its policy. Moreover, more than two and a half years before Mist Pharmaceuticals entered into the global settlement, Berkley unequivocally stated in its answer to the coverage complaint that it had no obligation to insure Mist Pharmaceuticals for the claims asserted in the underlying actions.[13]

Given that long history of reservations of rights and other communications by Berkley, Mist Pharmaceuticals cannot establish that it entered into the global settlement of CelestialRX's claims in justifiable reliance on any commitment by Berkley to cover those claims or contribute any portion of its policy limit to that settlement. Mist Pharmaceuticals thus

---

[13] The dissent contends that "Berkley never disclaimed all insurance coverage relying on the capacity exclusion and it never gave notice of the possibility of such a disclaimer." Post at ___ (slip op. at 7). To the dissent, Berkley's reservation of its right to disclaim coverage "for 'allegations pertaining to [Krivulka's] roles with Mist Acquisition, Mist Partners, Akrimax or any other [uninsured] entity'" is somehow inconsistent with a reservation of Berkley's right to invoke the capacity exclusion and deny any coverage for the misconduct alleged in the underlying actions. Post at ___ (slip op. at 13) (alterations in original). Given the capacity exclusion's broad terms -- and the fact that every allegation against Mist Pharmaceuticals in the underlying actions was an allegation "in any way involving" Krivulka's roles with Akrimax, Mist Acquisition, Mist Partners, and/or other uninsured entities -- Berkley's reservation of rights letters squarely placed Mist Pharmaceuticals on notice that Berkley's exclusion would be invoked to bar coverage for that misconduct. That notice was underscored by Berkley's assertion in this litigation -- well before the settlement of the underlying actions -- that by virtue of the capacity exclusion, it had no obligation to insure Mist Pharmaceuticals in the underlying actions. The considerations that supported a finding of estoppel in Griggs, 88 N.J. at 353-55, are absent here.

47

stands in stark contrast to the insured in <u>Griggs</u>, who received no communication from the insurer remotely suggesting that coverage was in question or might be disclaimed. <u>See</u> 88 N.J. at 353-55.

In sum, we do not view the doctrine of estoppel or the doctrine of forfeiture to support Mist Pharmaceuticals' position in this appeal.

Because we view the capacity exclusion to govern this coverage dispute, we agree with the Appellate Division that Berkley's refusal to consent to the settlement was not unreasonable, and the trial court improperly granted Mist Pharmaceuticals' motion for summary judgment and denied Berkley's motion for partial summary judgment. <u>See</u> <u>Mist Pharms.</u>, 479 N.J. Super. at 137-38, 142-43.[14] In light of our holding that the capacity exclusion in the policy bars coverage, we do not reach the question whether the global settlement was reasonable and entered into in good faith or the question whether the trial court properly excluded the affidavit of Berkley's corporate designee from the record. We decline to disturb the Appellate Division's holding remanding this

---

[14] The dissent asserts that this Court cannot decide this matter because there are factual disputes regarding "(1) whether Berkley breached the Policy by unreasonably withholding its consent to settle; and, if so, (2) whether the settlement reasonably apportioned any loss from wrongful acts by Mist Pharma and Krivulka in his capacity as chairman of Mist Pharma; (3) whether the settlement amount is reasonable; and (4) whether the Mist Insureds settled in good faith." <u>Post</u> at ___, ___ (slip op. at 38, 48). Because we find no breach of Berkley's policy by virtue of its decision not to consent to the settlement, the remaining issues identified by the dissent are not before us.

matter for an award of counsel fees up to July 7, 2021, which Berkley did not challenge in a cross-petition for certification.  See id. at 143.

V.

The judgment of the Appellate Division is affirmed as modified, and the matter is remanded for further proceedings in accordance with this opinion.

CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS, WAINER APTER, and NORIEGA join in JUSTICE PATTERSON's opinion.  JUSTICE FASCIALE filed a dissent in which JUSTICE HOFFMAN joins.

Mist Pharmaceuticals,
LLC,

Plaintiff-Appellant,

v.

Berkley Insurance
Company,

Defendant-Respondent.

JUSTICE FASCIALE, dissenting.

Because of Berkley Insurance Co. (Berkley)'s woefully late and unreasonable delay in informing the Mist Insureds of its belated position that the capacity exclusion completely bars coverage, it is estopped from relying upon this exclusion as an absolute defense. For over five years, Berkley repeatedly represented to the Mist Insureds that partial coverage was available under the policy at issue. In multiple letters sent in 2016 and 2017, Berkley admitted that, under the capacity exclusion, "coverage for Krivulka is limited to any actual or alleged conduct in his capacity as chairman of Mist Pharma." But it was not until <u>five years later</u> -- after multiple briefings, motions, and oral arguments -- that Berkley finally decided to argue that the exclusion at issue excluded <u>all</u> coverage. As we held in <u>Griggs v. Bertram</u>, when an

"insurance carrier fails for an unreasonable time to inform the insured of a potential disclaimer, it is estopped from later denying coverage under the insurance policy." 88 N.J. 347, 363-64 (1982). Accordingly, the majority errs in concluding that Berkley can rely on the capacity exclusion as a complete bar to coverage. An insurer cannot be permitted to make representations of coverage for years, only to then reverse course in a thirteenth-hour attempt to disclaim coverage upon which the insured reasonably relied.

As to the capacity exclusion at issue, our law is clear. Insurance policy exclusions must be narrowly interpreted -- they are strictly construed against the insurer, and, therefore, "if there is more than one possible interpretation of the language, courts apply the meaning that supports coverage rather than the one that limits it." Flomerfelt v. Cardiello, 202 N.J. 432, 442 (2010); accord Am. Motorists Ins. Co. v. L-C-A Sales Co., 155 N.J. 29, 41 (1998); Norman Int'l, Inc. v. Admiral Ins. Co., 251 N.J 538, 552 (2022).

Here, the majority broadly and liberally interprets the capacity exclusion to bar all coverage, including loss arising out of wrongful acts committed in an insured capacity. I do not agree with the majority's interpretation of the capacity exclusion; as I read the exclusion, it does not clearly bar all coverage for wrongful acts committed in both insured and uninsured capacities. At best, there is more than one way to interpret the exclusion, and we must therefore

2

apply the meaning that supports coverage.  To hold otherwise is violative of our longstanding insurance jurisprudence.

The plaintiffs in the underlying lawsuits sued multiple defendants including Mist Pharmaceuticals (Mist Pharma) and its chairman, Joseph Krivulka (collectively, the Mist Insureds).  Those plaintiffs sought damages from the Mist Insureds, alleging that Mist Pharma committed wrongful acts and that Krivulka committed wrongful acts in insured and uninsured capacities.  Mist Pharma held a Directors and Officers Insurance Policy (the Policy) from Berkley, which covered both Mist Pharma and Krivulka in his capacity as a member and officer of Mist Pharma.  To cap their liability exposure in the underlying cases, the Mist Insureds requested consent to settle from Berkley.  Berkley, however, withheld that consent.  The Mist Insureds then settled the underlying cases without Berkley's approval.[1]

The legal questions here are (1) whether Berkley is estopped from disclaiming all coverage based on the capacity exclusion; (2) whether the capacity exclusion bars all coverage for wrongful acts committed in dual

---

[1] The full value of the underlying cases was approximately $300 million.  A $12 million Global Settlement was reached, which includes a twenty-five percent apportionment for covered claims, meaning damages were capped at $3 million.  The policy limits were $2 million, which defense costs continue to erode, and the Mist Insureds seek indemnification only for the remaining limits.

3

capacities (i.e., when an officer acts in both insured and uninsured capacities); and (3) whether Berkley must pay, but not exceed, its remaining policy limits for any part of the underlying settlement. I disagree with the majority's disposition and reasoning on each issue.

As to the first question, I would hold that Berkley is estopped from relying on the capacity exclusion to exclude all coverage. Berkley never reserved its rights to rely on the capacity exclusion to disclaim <u>all</u> coverage. It reserved its rights to disclaim coverage only for wrongful acts committed in an uninsured capacity. Despite having the information it needed, Berkley waited more than five years to argue, for the first time, that the capacity exclusion excluded <u>all</u> insurance coverage. And it delayed making such an argument until the underlying actions settled and a judge had approved the Global Settlement. During settlement negotiations in the underlying lawsuits, the Mist Insureds believed that loss from wrongful acts committed in an insured capacity would be covered, and Berkley never said otherwise until all its other coverage arguments failed.

In answering the second question, the entire text of the capacity exclusion is important, but the word "capacity" provides critical context. As a matter of law, I would hold that the capacity exclusion does not bar <u>all</u> coverage when wrongful acts are simultaneously committed in both insured

4

and uninsured capacities -- it bars coverage only for wrongful acts committed in an uninsured capacity. Both the text and purpose of the Policy reflect that the Policy focuses on the specific capacity in which the officer or director acts. Thus, a director's actions cannot be excluded simply because the director acted in both uninsured and insured capacities. Rather, when some allegations pertain to actions taken in an insured capacity but other allegations pertain to actions in an uninsured capacity, the former must be covered even though the latter are not. Ascertaining what the insurer is required to cover therefore requires differentiating between the director's insured and uninsured capacities.

Accordingly, in order to determine if coverage exists, we must distinguish between Krivulka's insured and uninsured roles. The loss arising from Krivulka's alleged wrongful acts as chairman of Mist Pharma is covered by insurance because Krivulka committed those acts in an insured capacity. In contrast, loss arising from Krivulka's alleged wrongful acts with Mist Acquisition, Mist Partners, and Akrimax is not covered because those are uninsured entities. Unpacking the part of the settlement earmarked for loss from wrongful acts committed in an insured capacity is difficult. But that is no reason to bar all coverage.

Answering the third question must await resolution of four disputed issues of material fact. Determining Berkley's legal obligation to pay any part of the settlement in the underlying suits should depend upon whether (1) Berkley unreasonably withheld its consent to settle; and, if so, (2) whether the underlying settlement reasonably apportioned loss for Mist Pharma's wrongful acts and loss for Krivulka's wrongful acts committed in his capacity with Mist Pharma; (3) whether the settlement amount is reasonable; and (4) whether the Mist Insureds settled the underlying actions in good faith. Instead of grappling with those disputed fact issues, the majority bars all insurance coverage and dismisses the coverage complaint. Legal indemnification obligations cannot be resolved by any court on summary judgment due to those disputed issues of material fact.

The procedural history is complicated. After Berkley belatedly argued that the capacity exclusion bars <u>all</u> coverage, the trial judge rejected that contention and denied Berkley summary judgment. He correctly pointed out that "material fact disputes . . . litter the record with respect to [Krivulka's] actual role and activities vis à vis the various parties," and he added that the "actions of Krivulka must be considered . . . by a fact finder before a [legal] decision [as to indemnification] can be made." Those disputed fact issues that litter the record were never resolved at the trial level. Despite discovery

remaining incomplete and despite fact issues as to whether Krivulka committed wrongful acts in an insured capacity, the appellate court and majority rely on the capacity exclusion to dismiss this declaratory judgment complaint and grant Berkley summary judgment. But applying a de novo review, summary judgment on those grounds is still precluded by disputed issues of fact.

I would follow longstanding precedent, reverse the judgment of the Appellate Division, and remand for further proceedings consistent with this dissent.

I.

My first point of disagreement with the majority is its finding that Berkley is not estopped from invoking the capacity exclusion. Application of case law to the record before us compels a finding that Berkley is estopped from disclaiming all coverage based on the capacity exclusion. "Unreasonable delay in disclaiming coverage, or in giving notice of the possibility of such a disclaimer, . . . can estop an insurer from later repudiating responsibility under the insurance policy." Griggs, 88 N.J. at 357. Here, Berkley never disclaimed all insurance coverage relying on the capacity exclusion and it never gave notice of the possibility of such a disclaimer. The first time Berkley even mentioned disclaiming all coverage was more than five years after it agreed to

7

defend the Mist Insureds, and only after a judge had approved the settlement in the underlying actions. Based on Berkley's reservation of rights (ROR) letters, the Mist Insureds settled the underlying actions believing that they were at least insured for wrongful acts committed in insured capacities. The Mist Insureds only learned about Berkley's belated attempt to disclaim all coverage based on the capacity exclusion after they filed this coverage lawsuit.

This Court explained the rationale behind estoppel in situations when an insurer, acting "without a valid [ROR] to deny coverage at a later time," subsequently disclaims coverage:

> [O]nce the insurer has acknowledged the claim and assumes control of the defense, the insured is justified in relying upon the carrier to protect it under its policy and to be responsible for any judgment against it. The insured's justifiable reliance arises from the insurer's contractual right to control the defense under the policy. In assuming this contractual right of control, the insurer preempts its insured from defending itself. If the insurer could later repudiate its responsibility and ultimate liability under the policy, it would in effect have left its insured defenseless or seriously hampered in its ability to protect itself. That resultant inequity is a necessary ingredient of an estoppel.
>
> [Id. at 356 (citation omitted).]

In Griggs, defendant Bertram notified his insurer about the possibility of a claim shortly after he physically fought with Griggs. Id. at 353. The insurer failed to notify Bertram about the possibility that the claim would not be

8

covered. Ibid. The insurer established that Bertram punched Griggs twice, but it was not until seventeen months later -- right after Griggs filed a personal injury lawsuit against Bertram -- that the insurer disclaimed coverage, relying on an intentional tort exclusion. Id. at 354. Bertram initiated a third-party action against the insurer seeking to hold it responsible under the policy. Ibid. The personal injury lawsuit settled without the insurer's participation. Ibid. At the trial against the insurer, Bertram admitted he punched Griggs on purpose and conceded that this intentional tort was not covered by the policy. Ibid. The trial judge, however, estopped the insurer from denying coverage. Ibid. In affirming, this Court stated:

> We therefore conclude that where, after timely notice, adequate opportunity to investigate a claim, and the knowledge of a basis for denying or questioning insurance coverage, the insurance carrier fails for an unreasonable time to inform the insured of a potential disclaimer, it is estopped from later denying coverage under the insurance policy in the event a legal action is subsequently brought against its insured.
>
> [Id. at 363-64.]

Here, the underlying plaintiffs filed suit against the Mist Insureds and others in November 2015. The plaintiffs amended their complaint on March 8,

9

2016.[2] On March 9, 2016, Berkley notified the Mist Insureds that it would participate in the defense of the Mist Insureds while only reserving its right to disclaim coverage in the future for "allegations pertaining to [Krivulka's] roles with Mist Acquisition, Mist Partners, Akrimax, or any other [uninsured] entity." Berkley acted in a timely manner and provided notice that it would disclaim coverage for wrongful acts committed in an uninsured capacity.

But one important distinction must be made: Berkley never reserved its rights to disclaim coverage for loss arising from wrongful acts by Mist Pharma and wrongful acts by Krivulka acting in his insured capacity as chairman of Mist Pharma. Its ROR letters in March 2016 and July 2017 expressly state that

---

[2] Any reliance on Berkley's nineteenth affirmative defense to suggest that Berkley provided notice of the possibility that the capacity exclusion would bar all coverage is entirely misplaced by the exclusion's plain terms:

> Coverage for CelestialRX's claims against Mist Pharma is barred to the extent the allegations in the Underlying Action are based upon, arise out of, directly or indirectly result from or in consequence of, or in any way involve a "Wrongful Act" of an "Insured Person" serving in their **capacity** as a director, officer, trustee, employee, member or governor of **any other entity other than an "Insured Entity" or an "Outside Entity**," or by reason of their status as a director, officer, trustee, employee, member or governor of such other entity.

[(emphases added).]

10

Berkley reserved its rights only to disclaim coverage for "allegations pertaining to [Krivulka's] roles with Mist Acquisition, Mist Partners, Akrimax, or any other [uninsured] entity." It never reserved its rights as to wrongful acts by Mist Pharma and wrongful acts of Krivulka in his capacity with Mist Pharma. It did just the opposite -- Berkley stated that "coverage for Krivulka is <u>limited</u> to any [wrongful acts] <u>in his capacity as chairman of Mist Pharma</u>." (emphases added). Accordingly, the majority's assertion that "Berkley unequivocally stated in its answer to the coverage complaint that it had no obligation to insure Mist Pharmaceuticals for the claims asserted in the underlying actions," <u>ante</u> at ___ (slip op. at 46-47), is patently incorrect.

The Policy was meant to cover wrongful acts by Mist Pharma and wrongful acts by Krivulka in his capacity as chairman of Mist Pharma. Berkley had timely notice of the underlying claims, it fully evaluated the allegations in the underlying complaints, it relied on defense counsel's status reports and opinion letters, and it had substantial and adequate opportunity to investigate the underlying claims. Berkley even reserved its rights to retain separate counsel to represent Krivulka as to his alleged wrongful acts committed in an insured capacity. But Berkley failed to inform the Mist Insureds of any potential for disclaiming all coverage based on the capacity exclusion despite having all the information it needed before the filing of this

11

declaratory judgment action. Thus, Berkley is estopped from relying on the capacity exclusion -- five years after it agreed to participate in the defense and only after the underlying settlement occurred -- to deny coverage for the very thing the Policy was meant to cover.

Berkley's actions, moreover, underscore that it is estopped from asserting the capacity exclusion as an absolute defense. First, Berkley's conduct before the Mist Insureds filed its complaint in this coverage dispute demonstrates that it fully understood that the Policy covered both Mist Pharma and Krivulka for his alleged wrongful acts committed in his capacity as chairman of Mist Pharma -- an insured entity. And second, its conduct after the Mist Insureds filed this coverage case illustrates its understanding that the capacity exclusion does not wholly preclude coverage.

### A.

Before Mist Pharma filed this insurance coverage complaint, Berkley reviewed the allegations in the underlying complaints and agreed to participate in the defense of those matters under two carefully written ROR letters. Those ROR letters were meticulously written to reflect that some of the underlying claims were covered under the Policy and that some of the claims were not covered.

12

In its 2016 and 2017 ROR letters, Berkley expressly confirmed that the Policy provided insurance and protected Krivulka when he engaged in wrongful acts in his Mist Pharma capacity but not when he engaged in wrongful acts with uninsured entities. Berkley stated, "coverage for Krivulka is limited to [wrongful acts] in his capacity as the chairman of Mist Pharma."[3] In those same ROR letters, Berkley expressly stated that "[c]overage is therefore not available for Krivulka for allegations pertaining to his roles with [uninsured entities, including] Mist Acquisition, Mist Partners, Akrimax, or any other entity." Relying on the capacity exclusion, Berkley reserved its right to disclaim coverage <u>only</u> for "allegations pertaining to [Krivulka's] roles with Mist Acquisition, Mist Partners, Akrimax, or any other [uninsured] entity." It did not -- and could not -- reasonably reserve its right to deny insurance coverage for loss arising out of what the Policy was meant to cover: loss arising from any claim for any wrongful acts of Krivulka in his capacity as director of Mist Pharma.

In August 2017, before Mist Pharma filed this complaint, Berkley unsuccessfully withdrew from the defense of the underlying matters and

_____

[3] In the context of agreeing to pay for defense costs incurred in the underlying lawsuits, Berkley even reserved its "right to appoint separate counsel to represent Mist Pharma and Krivulka <u>in his capacity as director of Mist Pharma</u>." (emphasis added).

13

disclaimed coverage, not based on the capacity exclusion -- because it could not -- but rather by attempting to rely on a "related claims" exclusion. That is what prompted the Mist Insureds to file this insurance coverage complaint in September 2017. And Berkley's conduct thereafter continues to comport with my position that it is estopped from relying on the capacity exclusion as a complete bar to coverage.

B.

After the Mist Insureds filed this coverage case, they immediately filed a summary judgment motion challenging Berkley's misplaced reliance on the "related claims" exclusion and improper withdrawal from participating in the Mist Insureds' defense. Berkley opposed the motion without raising the capacity exclusion. In December 2018, the trial judge granted the Mist Insureds' motion, rejected Berkley's "related claims" argument, and required Berkley to continue defending the Mist Insureds. The capacity exclusion was not even mentioned.

Even then, during the Mist Insureds' repeated requests for Berkley's consent to settle, Berkley did not withdraw from the underlying suit relying on the capacity exclusion. Instead, it waited more than five years -- and only after a judge in the underlying matter approved the settlement -- to argue, contrary to its previous written ROR concession that limited insurance coverage

14

existed, that <u>all</u> coverage is barred. During that five-year period, Berkley never disclaimed all coverage. As Berkley confirmed at oral argument, it had all the information it needed to make that argument while the underlying actions remained alive, but it still waited until after the underlying matters settled to invoke the exclusion.

As this coverage case limped along, Berkley did not invoke the capacity exclusion to bar all coverage in its many motions and filings in 2017, 2018, or 2019. It was not until December 2020 -- in response to the Mist Insureds' November 2020 summary judgment motion -- that Berkley first relied on the exclusion and contended, <u>for the first time</u>, that the capacity exclusion barred all coverage based on the initial allegations in the underlying complaint.

The trial judge cut through that belated contention, denied Berkley's cross-motion, and rejected Berkley's reliance on the capacity exclusion to exclude <u>all</u> coverage arising from wrongful acts by Mist Pharma and wrongful acts by Krivulka acting as chairman of Mist Pharma. The judge denied the motion for two reasons. First, there existed genuine issues of material fact about whether loss arose from any wrongful acts by Mist Pharma and wrongful acts by Krivulka acting as chairman of Mist Pharma. The judge insightfully explained:

> The court can only wonder why if this [capacity] exclusion had any applicability, Berkley would not

> have raised it [in December 2018] during the [parties'] hard-fought briefing on the duty to defend [two and one-half years earlier]. It was not mentioned. In any event, the court has concluded that . . . <u>material fact disputes . . . litter the record with respect to [Krivulka]'s actual role and activities vis à vis the various parties.</u>
>
> [(emphasis added).]

And second, in denying Berkley's cross-motion for summary judgment, the judge addressed the capacity exclusion and stated, "the motion record is not sufficiently distilled as to Krivulka's activities" to grant summary judgment, and as to disputed facts, he explained that the "<u>actions of Krivulka must be considered . . . by a fact finder before a decision can be made</u>."[4] (emphasis added).

Therefore, Berkley's conduct, before and after the Mist Insureds filed this coverage complaint, reflected not only Berkley's understanding that the capacity exclusion did not preclude coverage in the underlying actions, but also, and more specifically, that the capacity exclusion does not and cannot

---

[4] In October 2022, on reconsideration, the judge did not reach the capacity exclusion and instead found Berkley had to pay its remaining policy limits because Berkley unreasonably withheld consent to settle the underlying lawsuits. The judge granted reconsideration after he struck an affidavit submitted by a corporate designee, Carol Threlkeld, Assistant V.P. of Claims for Berkley, in opposition to Mist Insureds' motion. The propriety of striking that affidavit was not considered by the appellate court or majority.

16

preclude coverage for all loss arising from Krivulka's wrongful acts in his capacity with insured entities. The majority's conclusion that Berkley can rely on the capacity exclusion as a complete bar to coverage ignores both the facts and the law. Berkley's actions -- delaying its disclaimer and misleading the Mist Insureds -- are exactly the type of conduct estoppel is designed to remedy.

## II.

The majority next errs in its interpretation and application of the capacity exclusion.

Interpretation of a capacity exclusion is an issue of first impression in New Jersey, but the applicable interpretative principles are well-established. "An insurance policy is a contract that will be enforced when its terms are clear in order that the expectations of the parties will be fulfilled." Flomerfelt, 202 N.J. at 441. We interpret an insurance policy "according to its plain and ordinary meaning." Ibid. (quoting Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992)). The Court should "not 'engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased.'" Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 200 (2016) (quoting Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008)). But

"where the policy language of an insurance policy supports two meanings, one favorable to the insurer and the other to the insured, <u>the interpretation favoring coverage should be applied</u>." <u>Progressive Cas. Ins. Co. v. Hurley</u>, 166 N.J. 260, 273 (2001) (emphasis added) (brackets omitted) (quoting <u>Lundy v. Aetna Cas. & Sur. Co.</u>, 92 N.J. 550, 559 (1983)).

"Exclusionary clauses are presumptively valid and are enforced if they are 'specific, plain, clear, prominent, and not contrary to public policy.'" <u>Flomerfelt</u>, 202 N.J. at 441 (quoting <u>Princeton Ins. Co. v. Chunmuang</u>, 151 N.J. 80, 95 (1997)). However, "insurance policy exclusions <u>must be narrowly construed</u>; the burden is on the insurer to bring the case within the exclusion." <u>Am. Motorists Ins. Co.</u>, 155 N.J. at 41 (emphasis added) (quoting <u>Princeton Ins. Co.</u>, 151 N.J. at 95). Accordingly, "exclusions are ordinarily <u>strictly construed</u> against the insurer, and <u>if there is more than one possible interpretation</u> of the language, courts <u>apply the meaning that supports coverage</u> rather than the one that limits it." <u>Flomerfelt</u>, 202 N.J. at 442 (emphases added) (citation omitted).

The capacity exclusion at issue here denies insurance coverage for wrongful acts committed in an uninsured capacity. Accordingly, when a director engages in wrongful acts in both insured and uninsured capacities, coverage is not entirely foreclosed -- loss arising from a director's acts with an

18

insured entity remains covered.  The majority, however, views the capacity exclusion to bar coverage whenever the underlying allegations in any way involve an insured committing a wrongful act as a director, member, or manager of an uninsured entity.  I disagree with that broad interpretation.  And, regardless, because the capacity exclusion is at best ambiguous, our case law compels us to adopt the interpretation finding coverage.

I reach those conclusions in view of (A) the purpose of capacity exclusions, (B) case law interpreting capacity exclusions, (C) the text of the Policy at issue, (D) application of the Policy to the allegations in the underlying complaints, and (E) my rejection of the majority's overly broad interpretation.

A.

Before discussing the capacity exclusion, some background on this type of insurance policy is instructive.  Directors and Officers (D&O) Liability Insurance protects corporate directors and officers from personal liability for acts and decisions performed or made in a corporate capacity.  9A Couch on Insurance § 131:32 (June 2025 Update).  Because a wide variety of claims can be brought against corporate officers -- from common law allegations such as breach of fiduciary duty to shareholder derivative suits -- corporations face significant legal costs.  David J. Marchitelli, Construction & Application of

19

Directors & Officers Insurance Policy, Exclusive of Exclusion & Notice of Claim Provisions, 22 A.L.R. 6th 113 (2007).  Accordingly, corporations, including for-profit organizations, non-profit organizations, trusts, and school districts, commonly purchase D&O insurance to protect against those legal expenses.  Law of Corporate Officers & Directors:  Indemnification & Insurance (Officers & Directors Law) § 4.1 (Nov. 2024 Update); 4 New Appleman on Insurance Law (Appleman) § 26.01(1) (Rev. 2021).  The "chief function" of a D&O policy is to "encourage independent directors to serve . . . as directors."  Appleman § 26.01(1).  D&O insurance accomplishes that objective by protecting directors and officers from financial losses arising from their management decisions.  Coverage extends to all acts "which are inseparable from the insured's duties as officer or director even though such activities may not arise 'solely' out of the insured's official capacity."  9A Couch on Insurance § 131:32 (June 2025 Update).

Officers and directors often work in various capacities.  D&O insurance functions as a critical safeguard for company executives because those policies offer protection against claims that arise from their actions taken in the course of their duties as corporate officers.  See In re First Cent. Fin. Corp., 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) ("D&O policies are obtained for the protection of individual directors and officers.").  The policy typically makes this insured

20

capacity limitation clear through either a limiting term or a capacity exclusion. Howard B. Epstein & Theodore A. Keyes, Insured Capacity and Outside Capacity: Status Matters, N.Y.L.J. (Jan. 25, 2024).

Limiting terms, which are "tantamount to exclusions," often reduce coverage to only alleged wrongdoing with an insured entity. Appleman § 26.07(1). Many D&O policies limit coverage by narrowly defining the term "wrongful act" so that "it does not include liability of individual insureds not claimed solely by reason of their being directors or officers." Ibid. For example, if a director or officer is sued for misconduct committed solely in their capacity as a shareholder of the company, coverage would not apply as the alleged wrongdoing occurred in an uninsured role. Ibid.

When a corporate officer acts in only one capacity, D&O coverage is clear. If a director engages in a wrongful act in his capacity as an insured person -- as a director or officer of an insured entity -- the loss arising from that wrongful act is covered. Officers & Directors Law § 4.9; see also Abrams v. Allied World Assurance Co. Inc., 657 F. Supp. 3d 1280, 1288 (N.D. Cal. 2023) (finding that a capacity exclusion did not exclude coverage because the alleged acts were committed in the insured persons' capacity as company executives). If a director instead engages in a wrongful act outside of his corporate role with the insured entity -- for example, in a personal capacity or

21

with some entity other than the insured entity -- the capacity exclusion of the D&O policy denies insurance coverage. Officers & Directors Law § 4.15; see also Sauter ex rel. Sauter v. Hou. Cas. Co., 276 P.3d 358, 362-63 (Wash. Ct. App. 2012) (finding that a D&O policy did not provide coverage for a CEO's losses arising from a bank's enforcement of a loan guaranty that the CEO had executed for the LLC because the CEO executed the guaranty in his personal, not his official, capacity).

But officer or director actions may not be so cleanly delineated. Sometimes, like here, they may commit wrongful acts in dual capacities -- acting both in their capacity as a director or officer of an insured entity and in their capacity with an uninsured entity. In that situation, both covered and uncovered claims exist. The capacity exclusion will preclude coverage only as to wrongful acts committed with an uninsured entity. But loss arising from wrongful acts with an insured entity are covered. "[N]othing . . . support[s] the conclusion that the presence of uncovered claims obviates an insurer's duty to indemnify its insured with respect to covered claims." McAninch v. Wintermute, 491 F.3d 759, 771 (8th Cir. 2007). Insureds are entitled to the coverage that they reasonably expect, both as a matter of policy construction and of public policy. See Flomerfelt, 202 N.J. at 441.

B.

When interpreting a capacity exclusion, courts look to the capacity in which the director acted when committing the alleged wrongful act.[5]  For example, in Zayed v. Arch Insurance Co., the District of Minnesota declined to construe a capacity exclusion broadly to bar all coverage where a corporate director committed wrongful acts in dual capacities.  932 F. Supp. 2d 956, 970-71 (D. Minn. 2013).  The D&O insurer argued that a capacity exclusion precluded coverage because the underlying complaint alleged the director acted "at all times on behalf of both an insured organization . . . and a noninsured organization."  Id. at 970.  The court disagreed, finding that the insurer's "interpretation of the insured-capacity exclusion [was] not clearly mandated by the language of that exclusion."  Id. at 971.  Moreover, the court concluded the capacity exclusion did not bar coverage for the claims "pertain[ing] to acts committed by [the director] solely in his capacity as director of [the insured entity]."  Ibid.

---

[5]  The majority asserts that the out-of-state cases to which I cite -- cases that involve interpretation of capacity exclusions and wrongful acts taken in both insured and uninsured capacities -- are "not relevant to this appeal."  Ante at ___ n.12 (slip op. at 39 n.12).  But relevant authority may and should involve out-of-state and analogous case law, particularly as the interpretation of a capacity exclusion is an issue of first impression before this Court.  See Petro-Lubricant Testing Labs. Inc. v. Adelman, 233 N.J. 236, 252 (2018).

Similarly, in <u>McAninch</u>, the Eighth Circuit rejected an insurer's argument that a D&O policy's limited definition of "wrongful act" barred all coverage where directors committed wrongful acts while acting in dual capacities. 491 F.3d at 770-71. Instead, the court found "ample support" for concluding that an insurer had a duty to indemnify covered claims when both covered and uncovered claims existed, and that this duty applied where the underlying claim clearly alleged wrongful conduct by the insured in their capacity as a director of an insured entity. <u>Id.</u> at 771-72; <u>see also</u> <u>Grigg v. Aarrowcast, Inc.</u>, 909 N.W.2d 183, 197-98 (Wis. Ct. App. 2018) (holding that a D&O policy covered the director's purported wrongful acts taken while acting as a director of the insured entity, "regardless of whether those acts were the same acts or omissions he was making" in his uninsured capacity).

When determining whether a capacity exclusion precludes coverage, courts consider whether the underlying complaint alleged that the director or officer committed wrongful acts in an insured capacity. <u>See</u> <u>Abrams</u>, 657 F. Supp. 3d at 1282. In <u>Abrams</u>, the Northern District of California concluded that a capacity exclusion did not bar coverage in light of the underlying complaint. <u>Id.</u> at 1287. Although the pleadings claimed the officers and directors of Altierre Corporation, the insured entity, breached their fiduciary duties by purportedly taking control of the Altierre board and stripping the

24

company of its assets for the benefit of an uninsured entity (where the officers also served as corporate officers), the court clarified that the claims asserted against the insureds in the underlying action were "for breach of fiduciary duties owed solely based on their capacities as Altierre executives." Ibid.

The court thus found that the capacity exclusion did not bar coverage in the underlying action because the claims against the defendants arose from their insured capacities as executives of the insured entity. Id. at 1288. The court declined to follow out-of-state cases that did bar coverage under a capacity exclusion, noting that those cases did not apply California law, which -- like New Jersey law -- requires that insurance policies be "interpreted broadly to afford the greatest possible protection to the insured," id. at 1285, and that "exclusionary clauses [be] interpreted narrowly against the insurer," id. at 1289 (quoting MacKinnon v. Truck Ins. Exch., 73 P.3d 1205, 1213 (Cal. 2003)).

### C.

To apply the capacity exclusion in this case -- a case dealing with an insured person acting in dual capacities -- I must explain what the Policy at issue does and does not cover. The Policy broadly covers loss arising from wrongful acts. The D&O Policy states:

I. Insuring Agreements

25

A.  Directors and Officers Liability Insurance

This Policy shall pay on behalf of the Insured Persons all Loss arising from any Claim . . . for any actual or alleged <u>Wrongful Act</u>.

. . . .

III.  Definitions

. . . .

E.  Insured Person means:

1.  any past, present or future duly elected or appointed director or officer of an Insured Entity, or

2.  any past, present or future duly elected or appointed member of the board of managers, member of the management committee, or equivalent executive of an Insured Entity if organized as a limited liability company.

. . . .

G.  Wrongful Act means:

1.  with respect to the Insured Persons, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Insured Persons <u>in the respective capacities</u> as such, or any matter claimed against them by reason of their status as an Insured Persons, or any matter claimed against them arising out of their serving as a director, officer, trustee or governor of an Outside Entity in such capacities, but only if such service is at the

26

specific request or direction of the Insured Entity, or

2. with respect to an Insured Entity, an actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Insured Entity.

[(emphases added).]

Mist Pharma is an insured entity, Krivulka is an insured person, and the Policy provides insurance for losses arising from any claim for any actual or alleged wrongful act by an insured person when they act in an insured capacity.

The Policy excludes from insurance coverage loss arising in any way from wrongful acts committed in uninsured capacities. The exclusion states:

IV. Exclusions

[T]he Insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured:

G. based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any Wrongful Act of an Insured Person serving **in their capacity** as director, officer, trustee, employee, member or governor of any other entity other than an Insured Entity or an Outside Entity or by reason of their status as director, officer, trustee, employee, member or governor of such other entity.

[(emphases added).]

27

The text of the exclusion does not expressly state that the Policy wholly precludes coverage when a director acts in dual capacities. Rather, the text of both the capacity exclusion and the text of the definition of "wrongful acts" focus on the capacity in which the officer <u>committed</u> the wrongful acts. Specifically, those provisions turn on whether the corporate officer committed the wrongful acts in their capacity as an insured person or in an uninsured capacity. Thus, insurance coverage depends on the "capacity" in which the insured person commits wrongful acts.

D.

Upon review of the allegations in the underlying complaints, I would hold that the capacity exclusion here does not wholly bar coverage for the underlying claims at issue. Rather, loss resulting from Krivulka's wrongful acts in his capacity with insured entities remain covered.

In this case, both the underlying New Jersey and Delaware complaints alleged that Krivulka committed wrongful acts while acting as director of Mist Pharma. In the New Jersey complaint, the plaintiffs claimed that Krivulka entered into agreements with Akrimax "to shift valuable assets to . . . Mist Pharma[] for no consideration." The complaint also asserted that Krivulka included a provision in an agreement between Mist Pharma and Akrimax which allowed Mist Pharma to "terminate and retake Akrimax's" distribution

28

rights to Primlev, a pain medication. The allegations pertain directly to wrongful acts committed in an insured capacity. For Mist Pharma to be a part of those agreements, Krivulka, the chairman of Mist Pharma and owner of 97.3 percent of the company, acted in his capacity as director of Mist Pharma -- an insured capacity.

The plaintiffs also alleged that Krivulka sent Akrimax a letter on behalf of several companies, including Mist Pharma, exercising their right to terminate Akrimax's distribution rights to Primlev, resulting in unjust enrichment, conversion, tortious interference with contract, tortious interference with prospective economic advantage, and waste. In addition, the complaint claimed that defendants -- including Mist Pharma -- aided and abetted Krivulka in breaching his fiduciary duties owed to Akrimax and Celestial, committed civil racketeering, and participated in a civil conspiracy. Plaintiff's Delaware complaint contained similar allegations.

Accordingly, although complicated, the complaints nonetheless assert numerous allegations that Krivulka engaged in wrongful acts while operating in his insured capacity as director of Mist Pharma, and, as the trial judge correctly pointed out, "material fact disputes . . . litter the record with respect to [Krivulka's] actual role and activities vis à vis the various parties." He

29

added that the "actions of Krivulka must be considered . . . by a fact finder before a [legal] decision [as to indemnification] can be made."

The majority states that it "view[s] every claim in the underlying actions to fit within the capacity exclusion's expansive terms." Ante at ___ (slip op. at 38). As I make clear above, both the Delaware and New Jersey lawsuits assert a slew of allegations that Krivulka engaged in wrongful acts as a director of Mist Pharma, an insured entity. Although I only address a few of these allegations, the record is replete with such claims. I agree with the majority that this case and the underlying complaints are far from black and white -- Krivulka committed wrongful acts in numerous capacities, many of which were in an uninsured capacity. But as the majority notes, some "claim[s] certainly relate[] to Krivulka's role at Mist Pharma[]." Ante at ___ (slip op. at 36). To treat those claims as incurably tainted by Krivulka's wrongful acts with an uninsured entity, and precluded from coverage, is to render not only the capacity exclusion but also the entire D&O Policy meaningless. Delineating the precise capacity in which Krivulka acted may indeed be complex and challenging. But the mere difficulty of this task does not justify a sweeping and simplistic application. To do so is to abdicate our responsibility to fairly interpret this Policy with its intended purpose and meaning.

Indeed, Berkley engaged in conduct throughout the litigation reflective of my interpretation of the capacity exclusion. As noted above, Berkley reviewed the allegations in the underlying complaints and agreed to participate in the defense of those matters. In two carefully written ROR letters, Berkley confirmed that coverage existed when Krivulka engaged in wrongful acts in his Mist Pharma capacity but not when he engaged in wrongful acts with uninsured entities: Berkley explicitly stated that it reserved its right to disclaim coverage only for "allegations pertaining to [Krivulka's] roles with Mist Acquisition, Mist Partners, Akrimax, or any other [uninsured] entity." And throughout this matter, Berkley did not contend that the capacity exclusion barred all coverage in its filings in 2017, 2018, or 2019. Rather, it relied on another exclusion as its basis to deny coverage. Berkley's conduct emphasized not only Berkley's own understanding that the capacity exclusion did not wholly preclude coverage in the underlying actions, but also, and more specifically, that the capacity exclusion does not and cannot preclude coverage for all loss arising from Krivulka's wrongful acts in his capacity with insured entities.

## E.

The majority misreads the capacity exclusion at issue to bar all coverage whenever the underlying allegations "'in any way involved' a 'wrongful act'"

31

as a director, member, or manager of an uninsured entity.  <u>Ante</u> at ___ (slip op. at 33).  The majority (1) erroneously focuses on the exclusion's "in any way involving" phrase; (2) disregards the Mist Insureds' reasonable expectation of coverage; and (3) misapplies <u>Norman International</u>.  Finally, (4) even if the majority's broad interpretation is valid, our case law compels us to strictly interpret policy exclusions and therefore apply the narrower interpretation to find coverage.

1.

First, context matters.  The majority errs in interpreting the phrase "in any way involving" in isolation.[6]  Such language must be interpreted in the context of the exclusion's purpose -- to bar insurance coverage for directors and officers that engage in wrongful acts <u>outside</u> their corporate role.  <u>E.g.</u>, <u>Flomerfelt</u>, 202 N.J. at 442 ("[C]ourts must be careful not to disregard the 'clear import and intent' of a policy's exclusion." (quoting <u>Westchester Fire Ins. Co. v. Cont'l Ins. Cos.</u>, 126 N.J. Super. 29, 41 (App. Div. 1973), <u>aff'd</u>

---

[6]  The majority is correct that the use of "or" in the exclusion's alternate phrases means that any one of those phrases may be considered alone.  But reading a single <u>phrase</u> alone does not mean that the phrase is read in isolation from the rest of the <u>Policy</u>.  Regardless of which phrase the majority gravitates towards, that phrase must be read in context with the capacity exclusion's text and purpose, as well as the overall Policy's text and purpose, which requires identifying the capacity in which the wrongful acts were performed.

32

o.b., 65 N.J. 152 (1974))).  And an exclusion's purpose cannot be properly understood without consideration of the Policy's overall scope of coverage. See id. at 441.

Here, in delineating the scope of coverage, the Policy defines a covered "Wrongful Act" by express reference to acts arising from an insured's "respective capacities," thereby predicating coverage on a director's specific role.  The capacity exclusion's "in any way involving" phrase should be read in consonance with that framing.  The majority errs by reading the exclusion to expansively bar all coverage when an insured acts in dual capacities, as such a reading renders the specific "respective capacities" of a director's acts entirely meaningless.  Moreover, the exclusion's plain text says absolutely nothing about the scope of coverage when an insured acts in dual capacities.  Had the parties intended for dual capacity acts to sweepingly bar all coverage, they would have drafted the exclusion to expressly say so.  See id. at 441-42. Accordingly, reading the capacity exclusion to exclude all coverage when wrongful acts are committed in dual capacities is an unduly broad interpretation because it greatly exceeds the exclusion's purpose -- barring coverage for wrongful acts that occur outside an insured capacity.

2.

Second, the majority's interpretation defeats the insured's reasonable expectation of coverage. The "fundamental principle of insurance law is to fulfill the objectively reasonable expectations of the parties." Werner Indus., Inc. v. First State Ins. Co., 112 N.J. 30, 35-36 (1988). Accordingly, "[w]hen there is ambiguity in an insurance contract, courts interpret the contract to comport with the reasonable expectations of the insured." Zacarias v. Allstate Ins. Co., 128 N.J. 590, 595 (2001); see also Flomerfelt, 202 N.J. at 441 (explaining that when "the terms are not clear . . . they are construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations").

As noted above, D&O policies are intended to provide insurance to directors and officers for actions taken while operating as directors and officers of the insured entity. The Policy here provides as much: it expressly covers loss resulting from a wrongful act of an insured person serving in an insured capacity and does not cover loss arising from wrongful acts of an insured person serving in an uninsured capacity. Thus, the Mist Insureds would and did expect, based on the underlying complaints, that the Policy would cover wrongful acts Krivulka took while serving in his insured capacity. The majority's holding -- that the insured is not entitled to coverage under the

34

capacity exclusion so long as a wrongful act in an insured capacity is linked in some way to a wrongful act in an uninsured capacity -- undermines the insured's reasonable expectation that coverage exists.

3.

Third, Norman International did not address a capacity exclusion, but rather a "Designated New York Counties Exclusion," and the two differ in both purpose and the factual allegations to which they apply. 251 N.J. at 541-42. The Norman International exclusion precluded coverage for certain injuries that were "actually or allegedly arising out of, related to, caused by, contributed to by, or in any way connected with . . . [a]ny operations or activities performed by or on behalf of any insured" located in specified New York counties. Id. at 546. The question in Norman International was whether that language required a causal relationship between the insured's conduct and the alleged injury. Id. at 542-43. This Court held that a causal link was not required, and the exclusionary clause barred coverage because the injury occurred in an excluded county. Id. at 543. But we neither considered nor addressed how the exclusionary clause would have applied if the injury was connected with an insured's operations in both an included and excluded county.

35

The crux of the dispute here concerns acts committed in both an insured and uninsured capacity. The majority is correct that the text of the Policy at issue is "closely analogous" to that of the Designated New York Counties Exclusion in Norman International, ante at ___ (slip op. at 32), but the acts alleged to have triggered them are fundamentally distinct. Norman International did not address the scope of coverage for dual allegations of included and excluded acts. Indeed, in that case, it was undisputed that the injury arose solely in an excluded county. 251 N.J. at 554-56. Accordingly, Norman International does not compel the majority's result because the allegations in that case were unmistakably, materially distinct in nature from those before us now.

4.

Finally, even if the majority's interpretation of the capacity exclusion is valid, an assumption that I cannot make, it is the broader of two possible ways to interpret that exclusion. As we have repeatedly held, when there is "more than one possible interpretation of the language," we must "apply the meaning that supports coverage rather than the one that limits it." E.g., Flomerfelt, 202 N.J. at 442; Zacarias, 168 N.J. at 595; Cypress Point Condo. Ass'n Inc. v. Adria Towers, LLC, 226 N.J. 403, 415-16 (2016). That is because of our

36

longstanding rule that policy exclusions must be <u>narrowly interpreted and</u> <u>strictly construed</u> against the insurer. <u>Ibid.</u>

Here, as noted above, I view the capacity exclusion to bar coverage only for wrongful acts committed in an uninsured capacity. Under such an interpretation, the exclusion does not impact the insurance coverage for wrongful acts committed in an insured capacity. Accordingly, because our precedent compels us to apply the possible meaning that supports coverage, we <u>must</u> conclude that acting both in an insured capacity and in an uninsured capacity cannot bar all coverage under this exclusion. To find otherwise would allow the capacity exclusion to deny insureds coverage to which they are entitled.

### III.

Lastly, as to my third point of disagreement, the majority errs in granting summary judgment notwithstanding the plethora of disputed issues of fact plaguing the record. By concluding the capacity exclusion completely bars coverage, the majority does not grapple with these dispositive issues. <u>See</u> <u>ante</u> at ___ n.14 (slip op. at 48 n.14).

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

37

challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 536 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The court's function is not to weigh the evidence and determine the outcome, but only to decide if a material dispute of fact exists. Gilhooley v. County of Union, 164 N.J. 533, 545 (2000).

## A.

Here, unresolved issues of material fact preclude a final legal resolution of whether Berkley must pay any part of the settlement in the underlying lawsuits. Specifically, the following four disputed factual issues must be resolved: (1) whether Berkley breached the Policy by unreasonably withholding its consent to settle; and, if so, (2) whether the settlement reasonably apportioned any loss from wrongful acts by Mist Pharma and Krivulka in his capacity as chairman of Mist Pharma; (3) whether the settlement amount is reasonable; and (4) whether the Mist Insureds settled in good faith.

38

1.

The parties dispute whether Berkley breached the Policy by unreasonably withholding consent to settle. "[I]nsurer[s] must exercise good faith and honest judgment in [their] approach to settlement negotiations." Fireman's Fund Ins. Co. v. Sec. Ins. Co. of Hartford, 72 N.J. 63, 76 (1976). "Particularly with respect to the settlement of claims, . . . 'the relationship of the [insurance] company to its insured regarding settlement is one of inherent fiduciary obligation.'" Lieberman v. Emps. Ins. of Wausau, 84 N.J. 325, 336 (1980) (alteration in original) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 492 (1974)).

The Policy requires the Mist Insureds to obtain Berkley's consent to settle. Under Section VI.A, entitled "Consent," the Policy states:

> An Insured shall not . . . enter into any settlement agreement . . . without the Insurer's prior written consent. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to full information and all particulars it may request in order to reach a decision regarding such consent. Any . . . settlements agreed to prior to the Insurer giving its consent shall not be covered hereunder.
>
> [(emphases removed).]

39

Without Berkley's consent, the Mist Insureds nevertheless settled the claim.[7]

In 2021, both parties filed motions for summary judgment on this issue, which the trial judge denied due to numerous fact issues. He painstakingly highlighted those disputed facts, concluding that "the record is indeed littered with issues of material fact as to both the reasonableness of Berkley's decision to not consent to fund the [underlying] Settlement [and] the information available to it at the time the request was made." Despite that conclusion, the trial judge granted summary judgment in the Mist Insureds' favor following their motion for reconsideration, finding as a fact that Berkley unreasonably withheld its consent. But this finding was premature as disputed fact issues about Berkley's withholding of consent remained, which precluded summary judgment to either party. And the judge's factual finding that Berkley unreasonably withheld its consent to settle was never fully considered by the appellate court or majority.

The Mist Insureds contend that they provided the information Berkley needed to reach a decision regarding consent, asserting that they supplied Berkley with interrogatory responses and 12,000 documents from the underlying actions; furnished multiple case analyses; provided status updates;

_____

[7] In October 2020, a Delaware court approved the settlement in the underlying actions.

40

analyzed the claims against the Mist Insureds; addressed liability exposure; and recommended settlement of the underlying suits. Additionally, the Mist Insureds claim that throughout the underlying settlement negotiations they kept Berkley informed of all material developments, including exchanges of offers and counteroffers. According to the Mist Insureds, Berkley repeatedly requested information that it already possessed, or sought details that the Mist Insureds could not readily produce because the underlying actions had not yet been fully litigated to conclusion.

Berkley insists that it needed more information before agreeing to consent to settle. Specifically, it claims that the Mist Insureds provided an insufficient analysis to support why Mist Pharma should be treated differently from the other defendants in the underlying actions and accept a disproportionate twenty-five percent allocation in the Global Settlement. Berkley contends that defense counsel omitted any breakdown of the nature of the various claims and failed to specify which claims created exposure to the Mist Insureds.

Reviewing the summary judgment motion record de novo (a record that remains incomplete because discovery was partially stayed), those genuine issues of material fact preclude summary judgment on whether Berkley breached the Policy by unreasonably withholding its consent to settle. If

41

Berkley breached the Policy by unreasonably withholding consent to settle, that means it forfeited its right to control settlement negotiations. See Fireman's Fund, 72 N.J. at 71.

If the case were remanded and a factual determination were made that Berkley reasonably withheld consent to settle, then, under the Policy, it would have no obligation to indemnify the Mist Insureds. But if Berkley breached its Policy by unreasonably withholding consent to settle, then Berkley's legal obligation to pay any amount of the underlying settlement would depend on three additional disputed facts: whether the settlement reasonably apportioned loss for wrongful acts by Mist Pharma and wrongful acts by Krivulka in his capacity as chairman of Mist Pharma; whether the settlement amount is reasonable; and whether the Mist Insureds settled in good faith. Fireman's Fund, 72 N.J. at 71-72; Griggs, 88 N.J. at 367-68. Once those fact issues have been resolved, a court can then resolve the issue of indemnification.

## 2.

The parties dispute whether the settlement reasonably apportioned loss for wrongful acts by Mist Pharma and wrongful acts by Krivulka in his capacity as chairman of that insured entity. "While the right to control settlements reserved to insurers is an important and significant provision of the policy contract, it is a right which an insurer forfeits when it violates its own

42

contractual obligation to the insured." Fireman's Fund, 72 N.J. at 71 (citations omitted). "The breach of an insurer's covenant, whether it be express or implied, leaves the insured free, despite the limiting policy provisions, to protect his own interest in minimizing a potential liability in excess of the policy limits by agreeing to a reasonable good faith settlement . . . ." Id. at 73. With "proof of the insurer's default," the insured can then "recover from it the amount of its policy limits." Ibid.

The Mist Insureds sought indemnity -- up to the remaining Policy limits -- before and after they settled the underlying actions. They requested payment for that part of the settlement related only to Mist Pharma's wrongful acts and Krivulka's wrongful acts in his capacity as chairman of Mist Pharma. Defense counsel for the Mist Insureds isolated that loss and explained to Berkley that the allocated twenty-five percent was attributed to the Mist Insureds due to the multiple bases for liability. The underlying allegations claimed that Mist Pharma, which was controlled, operated, and owned by Krivulka with approximately a ninety-five percent interest, stripped Akrimax, and in turn Celestial, of various pharmaceutical licenses and rights. The underlying liability theories included independent acts of conspiracy, as well as alter ego and veil piercing that together exposed Mist Pharma to joint and several liability for covered acts.

43

Accordingly, the Mist Insureds argue that the Global Settlement reasonably apportioned the loss for wrongful acts by Mist Pharma and by Krivulka acting as chairman of the corporation. Citing defense counsel's assessment of the underlying action, the Mist Insureds assert that the allocable share of the Global Settlement to Mist Pharma was justified by its determination that the Mist Insureds faced significant exposure. They also contend that the share of the settlement allocated to Krivulka was reasonable because Krivulka, acting as chairman of the insured Mist Pharma, was the main defendant in the underlying suit.

Berkley, on the other hand, argues that the twenty-five percent allocated to the Mist Insureds in the Global Settlement was disproportionate. Berkley emphasizes that the Global Settlement involved sixteen different entities and that most of the allegations made against the Mist Insureds were asserted against the other defendant corporations. Given that other defendants in the underlying actions faced the same exposure, a reasonable settlement, according to Berkley, would have split the remaining twenty-five percent among the sixteen other entities. Berkley argues there is no basis to allocate almost a quarter of the settlement to Mist Pharma.

There has <u>never been</u> a determination about whether the settlement reasonably apportioned loss for wrongful acts by Mist Pharma and Krivulka

44

acting as chairman of the company. On this record, we cannot resolve that factual dispute. If the fact finder were to determine that the settlement reasonably apportioned such loss, then the next questions would be whether the Mist Insureds reached a reasonable settlement and whether they settled in good faith.

3.

The parties dispute whether the settlement is reasonable. The insured bears the initial burden of demonstrating the "operative evidential facts" of the settlement "as to its reasonableness and good faith." Griggs, 88 N.J. at 367-68. Once the insured has made this showing, "the ultimate burden of persuasion as to these elements is the responsibility of the insurer." Id. at 368.

To determine whether a settlement is reasonable and made in good faith, "[t]he insured must show that the settlement is 'by the initial production of proof[,] . . . prima facie reasonable in amount and untainted by bad faith.'" Burlington Ins. Co. v. Northland Ins. Co., 766 F. Supp. 2d 515, 528 (D.N.J. 2011) (quoting Griggs, 88 N.J. at 367). "[R]easonableness and good faith require that the insured expend efforts to determine whether the claims are valid and whether the amount proposed is reflective of the injuries claimed." Excelsior Ins. Co. v. Pennsbury Pain Ctr., 975 F. Supp. 342, 357 (D.N.J. 1996).

The Mist Insureds argue that the reasonableness of the settlement is established by the judge who approved the Global Settlement in Delaware. Additionally, the Mist Insureds claim that since Mist Pharma received nearly ninety percent of the purported diverted payments from Akrimax, it was a key target in the underlying action and faced significant liability. The settlement, they say, is therefore reasonable.

Berkley claims that Mist Pharma was not a primary target in the underlying action and was situated identically to other defendant corporations. Berkley echoes its argument as to the settlement's disproportionate allocation of loss: other defendants were equally exposed to the same causes of action, Mist Pharma had strong liability defenses, and the settlement allocated an outsized share of liability to the company. Berkley argues that the settlement is unreasonable.

Once again, there has <u>never been</u> a factual determination made about whether the settlement amount is reasonable. On this record, we cannot resolve that factual dispute.

4.

The parties dispute whether the Mist Insureds settled the underlying actions in good faith. The Mist Insureds assert that they produced basic facts as to their good faith in agreeing to the Global Settlement. First, the Mist

46

Insureds claim that the Global Settlement presented them with an opportunity to achieve finality and eliminate the significant liability exposure that could have resulted from a judgment.[8] The Mist Insureds relied on Berkley's two ROR letters where Berkley represented that there existed coverage for wrongful acts committed by Krivulka in his capacity with Mist Pharma. By settling the Delaware case, the Mist Insureds averted incurring millions of dollars in defense costs. Second, the Mist Insureds explain that they conducted a thorough analysis of the claims against them, including liability exposure, and informed Berkley of the risk of a high-damages judgment. They submit that Berkley possesses no evidence that the settlement was entered other than in good faith.

Berkley has never fully developed its argument as to whether the Mist Insureds negotiated the settlement in good faith. And, once again, there has never been a factual determination made about whether the Mist Insureds settled the underlying case in good faith. On this record, we cannot resolve this factual dispute.

---

[8] The total liability exposure is estimated to be in the range of $300 million.

B.

Those four genuine issues of disputed material facts would first need to be resolved before a judge could answer the question of whether Berkley is legally obligated to pay up to its Policy limits for the underlying settlement in accordance with my holding as to the capacity exclusion. I would therefore remand for further proceedings. Because the Appellate Division (and majority) did not reach whether the trial judge correctly struck the corporate designee's affidavit, I would first remand to the appellate court for that legal determination.

Thereafter, on remand to the trial court, the factual issues to resolve would include (1) whether Berkley breached the Policy by unreasonably withholding its consent to settle; and, if so, (2) whether the settlement reasonably apportioned any loss from wrongful acts by Mist Pharma and Krivulka in his capacity as chairman of Mist Pharma; (3) whether the settlement amount is reasonable; and (4) whether the settlement was entered into in good faith.

On remand to the trial court, the fact finder would not be tasked with determining legal insurance coverage questions, such as interpreting the capacity exclusion or ruling on Berkley's indemnification obligations. Rather, it would solely resolve disputed issues of material fact. In that regard, the

48

following special interrogatories would be a good starting point for consideration:

(1) Did Berkley unreasonably withhold its consent to settle?

> If not, stop deliberating.
> If yes, go to question 2.

(2) Did the settlement in the underlying action reasonably attribute loss to the Mist Insureds for wrongful acts committed by Mist Pharma and wrongful acts by Krivulka in his capacity as chairman of Mist Pharma?

> If not, stop deliberating.
> If yes, go to question 3.

(3) Is the settlement amount reasonable?

> If not, stop deliberating.
> If yes, go to question 4.

(4) Did the Mist Insureds enter into the settlement negotiations in good faith?

> If not, stop deliberating.

Thereafter, application of my legal holding to those factual determinations -- that loss arising from wrongful acts of Mist Pharma and Krivulka's alleged wrongful acts as chairman of Mist Pharm is covered by insurance -- would guide the judge's legal determination of whether Berkley must pay for any part of the underlying settlement.

IV.

The majority's conclusion that Berkley can rely on the capacity exclusion as a complete bar to coverage ignores both the facts and the law. Berkley's actions -- delaying its disclaimer and misleading the Mist Insureds -- are exactly the type of conduct estoppel is designed to remedy. Our case law demands that Berkley be held to its prior assurances and therefore barred from relying on the capacity exclusion as an absolute defense.

As to the exclusion, a foundational feature of a D&O insurance policy is that coverage is limited to losses undertaken by officers and directors in their "capacities" with insured entities. The capacity exclusion does not exclude all coverage when officers and directors act in dual capacities. It excludes only loss arising from any wrongful acts committed by officers and directors in a "capacity" with uninsured entities. Wrongful acts committed in an insured capacity are covered.

For the foregoing reasons, I dissent.